**In re COMBUSTION, INC.**

**No. 94 MDL 4000.**

United States District Court,
W.D. Louisiana.
Lafayette–Opelousas Division.

Jan. 15, 1997.

### MEMORANDUM AND ORDER

HAIK, District Judge.

Pending before the Court is Certain Insurers' Motion for Summary Judgment on the issue of what law or laws govern Phases II and IV of this litigation, the resolution of

dispositive motions based on questions of law and the resolution of issues of contract coverage, respectively. Attachment A is a list of the insurers who joined this motion. Also before the Court are additional motions filed by most of these insurers adopting the Brief of Certain Insurers and setting out the particular facts of each insurer's contract. Attachment B is a chart of each insurer, its corresponding insured, the action raised in these motions and the law urged by that insurer.

At stake for these parties, ultimately, is insurance coverage for contracts spanning just over 30 years for tort and CERCLA damages associated with a Superfund site in Livingston Parish. Insurers urge no less than eight states' laws in their motion.

The majority of these insurers are responding to claims filed by the Plaintiffs' Class pursuant to the Louisiana Direct Action Statute, La. R.S. 22:655. Four insurers urge their motions solely with respect to contract disputes with each of their insureds. Attachment C. All of the insurers of Avondale Industries, and most of the insurers of Port Allen Marine Services, Inc. and Younger Brothers, Inc. face claims by the Plaintiffs and by their insured's on the same contract. Attachment D.

The Plaintiffs have filed an omnibus Motion urging the Court to find that Louisiana law governs all of these contract disputes.

At oral argument on October 18, 1996, this Court ruled from the bench that the circumstances of this case and the public policy of this state overwhelmingly supported the conclusion that Louisiana law applies to all actions brought pursuant the Direct Action Statute. This finding is supported by reasons below.

In addition, because Louisiana is the contaminated and contaminating state, the residence of the persons injured, the location where the injuries occurred and of the damaged property, the domicile or habitual residence of the injuring parties—the named insureds—this Court now finds that the State of Louisiana is the only state having a genuine interest in these contract disputes, *a fortiori*, Louisiana is the state whose policies would be most severely impaired if its laws were not used to interpret the contracts at issue. Relevant to this determination with respect to the contracts being sued on by both the Plaintiffs and the insureds is this Court's reluctance to interpret a single contract under two states' laws, particularly when the outcome would yield conflicting results.

Thus, this Court finds that Louisiana law governs the direct action and contract disputes in this litigation, and hereby GRANTS the Motion by the Plaintiffs and DENIES the Motions of the Insurers who urged the laws of other states.

This Court will first address the choice of law for actions brought by the Plaintiffs solely under the Louisiana Direct Action Statute. Then the Court will discuss the contract disputes between the insurers and their insureds.

### I.

In the early 1960's, Earl Dubose began the operation of what he termed an oil recycling and fuel oil resale business on property he owned in Livingston Parish, Louisiana. Residential properties surrounded the waste site. Dubose collected waste oil from his customers and processed the oil in pits he dug that were lined naturally with clay but no additional synthetic material. Early processing consisted of allowing the waste oil to separate on its own from other waste materials much like oil and vinegar salad dressing left standing on a shelf. Later Dubose found that heating the waste oil accelerated the separation process, and that the desired characteristic for fuel oil of flammability increased by adding chemicals to the waste oil such a toluene. Dubose stored the final product for resale as recycled fuel oil, an enterprising business particularly in light of the Arab oil embargo in the early 1970s. However, during the Dubose years, fires erupted at the facility, severe rains caused extensive flooding of the ponds into bordering canals, and several large oil spills occurred.

In 1977, Dubose sold the business to H. Arthur Gammons. Mr. Gammons incorporated the business under the name "Combus-

tion, Inc." and continued a similar but slightly more sophisticated operation until 1982 when he closed Combustion. Inc. because of financial and regulatory problems.

In 1985, the Louisiana Department of Environmental Quality (DEQ) became involved in this matter, as did the United States Environmental Protection Agency (EPA). The Combustion, Inc. site was listed on the National Priorities List as a Superfund site. The DEQ issued letters to "potentially responsible parties" (PRPs) it determined had disposed of used oil or chemicals at the site. In response to action by the DEQ, a group of approximately 23 PRPs formed a committee to clean up the site. To date remediation expenses exceed $17 million and could escalate tremendously if current testing reveals ground water contamination.

Over 10,000 individuals have completed Proof of Claim forms asserting both personal injury and property damage as a result of the operation of the waste site. Plaintiffs allege participation by 600—800 "generator" and "transporter" defendants, who caused or contributed to or delivered waste oil or toxic chemicals to the site. The allegations of harm resulting from exposure to toxic chemicals during the recycling process and as a result of the fires, floods and spills vary from fear, fright and anxiety regarding the possibility of future disease to wrongful death from disease caused by the exposure. Property damage claims run the gambit from contamination to diminution in value because of proximity to the site.

## II

This matter was initiated in 1986 with seventeen suits being filed in the Twenty-first Judicial District Court in Livingston Parish, Louisiana. Each of those state court suits sought to recover for alleged personal injury and property damage resulting from the contamination at the Dubose–Combustion site. One of these suits was filed on behalf of a class of persons who had claims related to the site. Defendants removed the suits twice to federal court, but remand was ordered in both instances.

Pursuant to an order of the Louisiana court, plaintiffs in all seventeen suits combined their allegations into one Master Amending and Supplemental Petition asserting claims on behalf of individuals as well as a class action on behalf of all persons in Livingston Parish allegedly injured from various types of exposure to toxic chemicals at the site. The class was certified by the state court and affirmed on appeal with the exception of the class definition, which was approved on the second appeal as follows:

> All persons or entities who or which own real or personal property and/or live and/or operate places of business and/or work and/or attend school in Livingston Parish, Louisiana, and/or who have been so situated during the time since the early 1960's, and who or which claim to have sustained damages as a result of the discharge, release or leakage of toxic substances from the premises now or formerly known as Combustion, Inc., and/or Earl G. Dubose, located at Dubois Lane and Milton Road and Burgess Road in Livingston Parish, Louisiana.

Thereafter, defendant McDermott, Inc. filed a Third Party Demand against American Cyanamid in each of the seventeen pending suits for contribution or indemnification for any amount which McDermott might be held liable to plaintiffs and for cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.* The matter was then removed by American Cyanamid to the United States District Court for the Middle District Court of Louisiana pursuant to 28 U.S.C. § 1441(c) on the basis of the Court's exclusive jurisdiction over all claims brought under CERCLA.

Simultaneously, McDermott filed third party claims against approximately two hundred potential "generators" and "transporters" and brought claims against the United States Government. In addition, McDermott filed suits in United States District Courts in Alabama, Florida and Mississippi under CERCLA with supplemental tort claims. McDermott then invoked a petition for Multidistrict certification permitting all suits to be consolidated for purposes of pre-trial proceedings.

In July of 1994, and by agreement of all parties, *Combustion* was transferred to the Western District of Louisiana. Shortly thereafter remand was denied, and in July of 1995, this Court adopted the previous class certification.

In 1995 and 1996, the Court allowed Plaintiffs' class to assert a direct action pursuant to La. R.S. 22:655 *et seq.* against all insurers of the main and third party defendants. In addition, the Court allowed all defendants and third party defendants to file cross-claims against their insurers. According to the Court's Case Management and Scheduling Orders, Phase I of *Combustion* was the CERCLA trial, scheduled to September 3, 1996. Phase II consists of dispositive motions primarily on insurance contract defenses argued throughout the fall of 1996 and 1997. Phase III is the tort trial and Phase IV will wrap up outstanding insurance contract disputes based on the factual determination made in Phase III.

These choice of law motions were argued as part of Phase II of this litigation.

## III

This Court has exclusive jurisdiction over all claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and discretionary power pursuant to 28 U.S.C. § 1367(a) to exercise jurisdiction over supplemental state law claims. The claims at issue are state law claims.

## IV

■ In a federal question action where the federal court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law riles of the forum state. *Paracor Finance, Inc. v. General Electric Capital Corp.*, 79 F.3d 878, 891 (9th Cir.1996); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). This Court will apply the Louisiana choice of law articles to determine the law or laws applicable to all claims filed under the Louisiana Direct Action Statute.

## V

The present right of a victim of tortious conduct to proceed directly against the insurance company in Louisiana is the product of a lengthy legislative and judicial process. 15 WILLIAM SHELBY MCKENZIE, H. ALSTON JOHNSON, III, *Louisiana Civil Law Treatise Insurance Practice* § 22 (1986)(hereafter referred to as McKenzie–Johnson § ——). At its most basic, it is an application of contract law that a third-party beneficiary may sue to enforce a contract for his benefit even though not himself a party to the agreement. The current form of the statute states in part:

A. No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors, mentioned in Civil Code Article 2315.1, or heirs against the insurer.

B. (1) The injured person or his or her survivors or heirs mentioned in Subsection A, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and the insurer jointly and in solido

\*    \*    \*    \*    \*    \*

(2) This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if such provisions are not in violation of the laws of the state.

C. It is the intent of this Section that any action brought under the provisions of this Section shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this state.

D. It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable; and, that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of the policy.

La. R.S. 22:655 (West 1996).

The origin of the Louisiana Direct Action Statute is Act 253 of 1918 providing that the insolvency or bankruptcy of the insured would not release the insurance company from liability, and in such case the victim was given a right of action against the insurer. *Esteve v. Allstate Ins. Co.*, 351 So.2d 117, 119 (La.1977); McKenzie–Johnson § 22. Act 55 of 1930 amended and broadened the original act to allow a "right of direct action" within the terms and limits of the policy by the victim against the insurance company alone or against both the tortfeasor and the insurance company jointly and in solido. Amendments further allowed that any action brought under the statute was subject to "all of the lawful conditions of the policy contract and the defenses which could by urged by the insurer to a direct action brought by the insured," provided those conditions were not in violation of state law. Id.

In 1950, the Legislature found it necessary to amend the statute to clear up confusion that had arisen over the application of the Direct Action Statute to policies issued in other states. McKenzie–Johnson § 22. Act 541 of 1950 provided that "[t]his right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana." A companion act, Act 542 of 1950, provided that "no certificate of authority to do business in Louisiana shall be issued to a foreign or alien liability insurer until such insurer shall consent to being sued by the injured person or his or her heirs in a direct action as provided [by La. R.S. 22:655], . . .", now codified as La. R.S. 22:983(E).

The Louisiana Supreme Court interpreted the language in Act 541 to mean that a right of direct action existed if the policy was issued or delivered in Louisiana, or, if the accident or injury occurred in Louisiana. *Webb v. Zurich Insurance Co.*, 251 La. 558, 205 So.2d 398 (1968).

Any doubts regarding the constitutionality of Louisiana applying the statute to out-of-state contracts was removed in *Watson v. Employers Liability Assurance Corp.*, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954), rehearing denied 348 U.S. 921, 75 S.Ct. 289, 99 L.Ed. 722 (1955). The plaintiff was a Louisiana citizen injured in Louisiana by a product purchased in Louisiana. The defendant was an insurer authorized to do, and doing, business in Louisiana, who had consented to be sued by direct action under La. R.S. 22:983(E). The policy in question had been issued and delivered out of state. The defendant objected to the Direct Action Statute and to the consent statute when applied to out-of-state policies. A unanimous Court upheld the application of the statute, particularly noting Louisiana's interest in protecting those injured within its borders. Specifically, the Court stated that "Louisiana's direct action statute is not a mere intermeddling in affairs beyond her boundaries which are of no concern of hers. Persons injured or killed in Louisiana are most likely to be Louisiana residents, and even if not, Louisiana may have to care for them. Serious injuries may require treatment in Louisiana homes or hospitals by Louisiana doctors. The injured may be destitute. They may be compelled to call upon friends, relatives, or the public for help. Louisiana has manifested its natural interest in the injured by providing remedies for recovery of damages. It has a similar

interest in policies of insurance which are designed to assure ultimate payment of such damages." *Id.* 348 U.S. at 71, 75 S.Ct. at 169.

Addressing concerns regarding the Full Faith and Credit Clause, the Supreme Court stated that "[that] Clause does not automatically compel a state to subordinate its own contract laws to the laws of another state in which a contract happens to have been formally executed. Where, as here, a contract affects the people of several states, each may have interests that leave it free to enforce its own contract policies. (Cites omitted). We have already pointed to the vital interests of Louisiana in liability insurance that covers injuries to people in that state. Of course Massachusetts [the domicile of the parent company—insured, and place where contract negotiated] also has some interest in the policy sued on in this case. .... *But plainly these interests cannot outweigh the interest of Louisiana in taking care of those injured in Louisiana. "Id.* (underline added).

■ One of the most important observations of the Direct Action Statute is that its language and its judicial interpretations almost entirely remove the insurance contract from governance by the established principles of contract law. McKenzie–Johnson § 26. The contract becomes one infused with important public policy concerns, written for the benefit of a non-party: the person injured by the blameworthy conduct of the contracting party. *Edwards v. Fidelity & Casualty Co.,* 11 La.App. 176, 123 So. 162 (Orl.Cir.1929). In *Edwards,* the insured had failed to give his insurer notice of the accident until eleven months after the incident. The victim successfully litigated the claim against the insured, and when he could not collect he proceeded against the insurer. The insurer's defense was that the "terms and limits of the policy" were violated because of the lack of "immediate written notice." The court found for the victim stating that "[i]t is quite true that [the *insured* ] Monahan's failure to give notice to his insurer would have prevented his recovery from the insurer, had he himself paid the judgment ..., but that is because Monahan so

contracted. As between parties to the contract, the contract itself is the law of the case. Here, however, the law of the case is not found solely within the four corners of the policy of insurance, but is contained primarily in the statute [La. R.S. 22:655]." (Underline added).

The Louisiana Supreme Court solidified the trend started in *Edwards* regarding the influence of third-party rights on the insurance contract as a result of the Direct Action Statute. In *West v. Monroe Bakery,* 217 La. 189, 46 So.2d 122 (1950), the Court addressed another claim by the insurer that breach of contract by late notice barred the direct action. The Court stated that the Direct Action Statute conferred "substantive rights on third parties to contracts of public liability insurance, which become vested at the moment of the accident in which they [were] injured,.... The facts in each case [might differ], but ... the result [remained] the same—the upholding of the statutorily granted right against the insurer regardless of a stipulation to the contrary between the insurer and the insured in the policy contract and regardless of dilatory conduct on the insured's part in giving notice." *Id.* 46 So.2d at 123. Other Louisiana courts addressing the particular matter of late notice have reasoned that insurers should not be allowed to use the notice requirement to evade the fundamental protective purpose of the contract and to assure payment of liability claims up to the policy limits for which the insurers collect premiums. *Champion v. Panel Era Mfg. Co.,* 410 So.2d 1230 (La.App. 3rd Cir.), *writ denied* 414 So.2d 389 (1982); *accord Pomares v. Kansas City So. Railway Co.,* 474 So.2d 976 (La.App. 5th Cir.), *writ denied* 477 So.2d 1131 (1985).

Finally, in *Quinlan v. Liberty Bank and Trust Company,* 575 So.2d 336 (La.1990), the Louisiana Supreme Court issued the crowning jewel for direct action plaintiffs, describing the tort victim's rights in the insurance contract that is essentially "modified" by the statute:

> [w]hen the statute is applicable and authorizes a direct suit against a tortfeasor's insurer, the statute is read into and becomes a part of a policy written pursuant

thereto, even though the policy does not contain the language required by the statute, or contains language prohibited by the statute.

*Id. at* 352 (cites omitted)(underline added).

Thus, although a direct action by an injured party is authorized "within the terms and limits" of the insurance policy, some of these terms and limits appear to be nullified when actions by the insured run afoul of specific terms of the contract and such actions are beyond the control of the victim. In addition, the "terms and limits" of the policy include the language of the Direct Action Statute itself.

All of these results can be and have been justified in the name of enforcement of the strong public policy expressed in the direct action statute that the insurance policy exists primarily for the protection of the injured person or the public in general, and that where an insurance fund has been purchased, it should be used to compensate the victim. McKenzie–Johnson § 27.

Thus, the right of direct action appears to be a unique right, clothed in significant policy concerns, that has profoundly affected traditional rules of contract interpretation with regard to the insurance contract in Louisiana. The "right of direct action" as described in La. R.S. 22:655 is more accurately characterized as a "cause of action" because it grants to the plaintiff a remedy for the harm revealed in his pleadings which—but for the statute—he would not have. The statute announces that a suit against the insurer directly is a permissible type of procedure. McKenzie–Johnson at note 34. It is contract dispute involving the victim and the insurer, where the victim is not a party to the contract but is vested with rights in the contract, arguably greater than but certainly distinct from the insured. and where the insurer steps into the shoes of its insured, *Vowell v. Mfrs. Casualty Ins. Co.,* 86 So.2d 909, 914 (La.1956).

■ Framed by this historical development of a direct action in Louisiana, the first issue before this Court is what law must this Court apply in a direct action suit by a class of Louisiana plaintiffs, allegedly injured in Louisiana by the acts of Louisiana domiciliaries or long-time residents. The insurers argued that law of the state of the insured's domicile should apply. The Plaintiffs contend that Louisiana law controls these direct actions.

## VI

Choice of law with respect to interpreting insurance contracts develops a life of its own when considered in the context of hazardous waste sites. MICHAEL SEHR, et al., *Insurance Coverage Litigation: Recent Developments,* 28 Torts & Ins. L.J. 333, 333. Because of the public's heightened sensitivity to environmental pollution in the last quarter century and because of the significant costs associated with these coverage disputes, a "virtual avalanche of coverage litigation between carriers and their policyholders has ensued to determine who may be ultimately responsible for the payment of these costs." EDWARD LAIRD, ELLIS MEDOWAY, *Debate Over the Resolution of Environmental Coverage Disputes,* 4 No. 2 Coverage 24, 24(1994). At the very core of these disputes, which have spawned hundreds of reported cases nationwide, is the interpretation to be accorded certain contractual language contained in comprehensive general liability (CGL) policies. *Id.*

In relatively localized environmental coverage actions, the choice-of-law issue can be straightforward. For, example, there is no choice-of-law issue where the policyholder is located in one state, the environmental liability arises out of the same state, and the policies are issued by a state-based insurer for that one site. *Id.* At the other end of the spectrum are cases where a single insured seeks coverage under CGL policies for certain environmental and toxic tort liabilities, including over eighty sites located in over twenty different states. *See Westinghouse Elec. Corp. v. Liberty Mutual Ins. Co.,* 227 N.J.Super. 504, 547 A.2d 1167 (1988), rev'd, 233 N.J.Super. 463, 559 A.2d 435 (1989).

The courts in New Jersey perhaps have had the most opportunity to develop a coherent choice of law approach in the context of environmental coverage actions, and insofar as the site is located in the state, the

courts there have been clear that the law of New Jersey will apply. *See generally* LAIRD, MEDOWAY, *"Morton International v. General Accident:* New Jersey Sparks a National Debate over the Resolution of Environmental Coverage Disputes," 4 No. 2 Coverage 24, (1994)(and cases cited therein). *See also Clean Venture, Inc. v. Fireman's Fund Insurance Co.,* No. UNN–L–1750–95 (N.J.Super.Ct.1996)(holding that New York law governed an environmental coverage action involving hazardous substances transported by a New Jersey Company to a New York site).

Several key factors have emerged in the choice-of-law analyses, each having predominate importance depending on the jurisdiction: the state where the contract was executed, *American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295, 1304 (1995), *Aetna Casualty & Surety Co. v. Dow Chemical,* 883 F.Supp. 1101, 1104–05 (D.Mich.1995); the state where the waste was generated, *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 839 F.Supp. 124 (D.R.I.1993)(reported in *Mealey's* 12/21/93); see *Morton International v. General Accident,* 134 N.J. 1, 629 A.2d 831 (1993); JOHN MATHAIS, JOHN SHUGRUE, "Choice of Law from the Policyholder's Perspective," 4 No. 5 Coverage 20, 23 (1994); the state where the waste was deposited, *Gilbert Spruance Co. v. Pennsylvania Mfrs. Assn.,* 134 N.J. 96, 629 A.2d 885 (1993); *MAPCO Alaska Petroleum, Inc. v. Central Nat'l Ins.,* 795 F.Supp. 941 (D.Alaska 1991); *Transamerica Ins. v. Thomas M. Durkin & Sons, Inc.,* 1991 WL 206765 (E.D.Pa. Oct.1991); *Travelers Indemnity v. Allied–Signal, Inc.,* 718 F.Supp. 1252 (D.Md.1989); *Chesapeake Utilities Co. v. American Home Assurance Co.,* 704 F.Supp. 551 (D.Del.1989); *Jones Truck Lines v. Transport Ins. Co,* 19 Envtl. L.Rep. 21,169, 1989 WL 49517 (E.D.Pa., May 9, 1989); *CPC Int'l, Inc. v. Aerojet–General Corp.,* 825 F.Supp. 795 (W.D.Mich. 1993); *Clean Venture v. Fireman's Fund Insurance Co.,* No. UNN–L–1750–95 (N.J.Super.1996); and, the notion that one body of law will govern the interpretation of a single contract, *see* LAURA JANSIK, KIRK HAYS, "The Role of State Law in Insurance Coverage Litigation", SA88 ALI–ABA 327, 337).

Courts adjudicating environmental insurance coverage have also begun to take particular note of the public policy considerations that may control choice of law analysis, for "allocation of clean-up costs is fundamental to any state's environmental policy." MATHIAS, SHUGRUE, "Choice of Law from the Policyholder's Perspective," 4 No. 5 Coverage 20, 22–23 (1994). In situations in which an insured or enterprise risk is involved, the [insured] should be entitled to the application of the more beneficial of the conflicting rules because the law is protective of the insured and because the policy which favors the spreading of the risk will often be considered a superior policy by the states involved. P. Hay, E. Scoles, *Conflict of Laws,* § 17.34 at 621, (2 ed.1992).

In the case at bar, in addition to the strong public policy statement in the Direct Action Statute, Louisiana's environmental policies set out by the Legislature must play a significant part in this Court's analysis. In accordance with La. R.S. 30:2002, the Louisiana Legislature states:

(1) The maintenance of a healthy and sale environment for the people of Louisiana is a matter of *critical state concern* (emphasis added).

(2) It is necessary and desirable for the protection of the public welfare and property of the people of Louisiana that there be maintained at all times, both now and in the future, clean air and water resources, preservation of the scenic beauty and ecological regimen of certain free flowing streams, and strictly enforced programs for the safety and sanitary disposal of solid waste, for the management of hazardous waste, for the control of hazards due to natural and man-made radiation, considering sound policies regarding employment and economic development in Louisiana.

Also, La. R.S. 30:2271 provides in part:

(1) Hazardous chemicals and substances have been disposed of in Louisiana for many years in a manner that, although possibly legal at the time, was careless and inappropriate and created conditions which

are extremely dangerous and may cause long-term health and environmental problems for the people of this state.

\*　\*　\*　\*　\*　\*

(3) Those persons generating these substances knew or were in a position to know of the hazardous and dangerous nature of the substances which they were producing and knew or should have known that improper disposal could have long-term health risks and could cause irreversible environmental damage.

(4) The state cannot and should not bear the costs associated with a private profit-making venture.

\*　\*　\*　\*　\*　\*

The Legislative's directive regarding the health and safety of its citizens and its environment where hazardous waste are involved rings loud and clear.

■ There are three basic conflict of law approaches: 1) the *lex loci contractus* doctrine; 2) the law of the site approach; and 3) multi-factor substantial interest test. LAURA JANZIK, KIRK HAYS, "The Role of State Law in Insurance Coverage Litigation," SA88 ALI–ABA 327, 335 (1996). Each of these approaches has its strengths and weaknesses. For instance, one fundamental rationale for the *lex loci contractus* doctrine guarantees that a single insurance policy will be governed by only one set of laws, that of the contracting state. *Id.* at 338; *State Farm Mut. Auto. Ins. v. Simmons' Estate,* 84 N.J. 28, 417 A.2d 488, 492 (1980)(noting that the lex loci contractus approach "furnishes certainty and consistency in the selection of the applicable law"); *accord American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295–1304 (1995). However, such an outcome is particularly undesirable in the situation where each nationwide insurer comes to court with its own nationwide policy interpretation derived from a different state of contracting. JANZIK, HAYS, "The Role of State Law in Insurance Coverage Litigation," SA88 ALI–ABA at 340; *Johnson Matthey, Inc. v. Penn. Mfrs.' Assn. Ins.,* 250 N.J.Super. 51, 593 A.2d 367, 371 (1991). The multi-factor substantial interest test is an outgrowth of the application of the Restatement (Second) of Conflict of Laws and was incorporated into the conflicts analysis in Louisiana, *infra,* prior to the State's adoption of the Conflict of Laws Code Articles in 1992.

However, the law of the site approach appears to be a result oriented rule rather than a true conflict analysis. Courts adopting the law of the site approach began by applying either of the other two tests, but concluded that the contaminated state's interest in the cleanup of hazardous substances always takes precedent over the conflict of laws considerations. JANZIK, HAYS, "The Role of State Law in Insurance Coverage Litigation," SA88 ALI–ABA at 342; *Johnson Matthey,* 593 A.2d at 373 (*noting* that the site specific approach "is particularly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved ...."). The law of the site approach is most readily applied in coverage disputes over liability arising at a single site. DIANE POLSCER, MARY BETH BARNEY, "Choice of Law In Environmental Coverage Cases," 4 No.5 Coverage 26, 27 (1994).

A survey of American choice of law cases involving environmental pollution coverage conducted at the request of the Conflicts Section of the Association of American Law Schools is instructive. In 1993, two of seven cases were decided under lex *loci contractus* while the remaining five cases including the very important New Jersey Supreme Court case of *Gilbert Spruance Co. v. Pennsylvania Mfrs.' Ass'n. Ins.,* 134 N.J. 96, 629 A.2d 885 (1993) were decided under the site-specific approach. SYMEON SYMEONIDES, "Choice of Law in the American Courts in 1994: A View from the Trenches," 43 American Journal of Comparative Law 1, 80 (1994). Though approximately the same ration was maintained in 1994, such a determination must be driven by the particular facts in each of these colossal environmental litigation cases.

The case at bar presents a situation unique thus far in Fifth Circuit Jurisprudence interpreting Louisiana law. This Court's research has not found any other environmental coverage action with similar factual circumstances where the issue of choice

of law was decided by Louisiana courts or by a federal district court using Louisiana choice of law analysis. This Court's analysis must incorporate much more than a simply examination of a contract dispute between private litigants. Policy considerations drive this Court's analysis.

## VII

On January 1, 1992, the newly codified Book IV of the Louisiana Civil Code, "Conflict of Laws", went into effect, "streamlining" the prevailing jurisprudence. SYMEON SYMEONIDES, "Louisiana's New Law of Choice of Law for Tort Conflicts: An Exegesis," 66 Tu.L.Rev. 677, 678 (1992). However, Louisiana has always provided statutorily for problems of conflict of laws. As early as 1808, Louisiana followed the civil law tradition and included choice of law rules in its first civil code, the Digest of 1808. SYMEON SYMEONIDES, "Louisiana Conflicts Law:" "Two Surprises," 54 La.L.Rev. 497, 497 (1994). The original articles 9 and 10 were renumbered later as articles 14 and 15 respectively and remained in effect until January 1, 1992. *Id.* They continue to apply to actions filed before that date. *Id.* at note 1. The new code articles apply to all actions filed after January 1, 1992. 1991 La. Acts 923. If the action was in progress in January 1, 1992, the old code articles apply. SYMEON SYMEONIDES, "Louisiana's New Law of Choice of Law for Tort Conflicts: An Exegesis," 66 Tu.L.Rev. at 685.

Plaintiffs urges the Court to apply Louisiana's choice of law analysis in effect in 1986 when the suit was filed; insurers contend that the direct action was not filed until 1995, so the new code articles apply.

This Court's choice of law analysis yields the same result under the pre- and post-codification articles and jurisprudence, pretermitting a determination of whether pre- or post-codification analysis should apply to the facts of this case.

## VIII

A fundamental precept of Louisiana's civil law system, which derives from article 1 of the Louisiana Civil Code, is that "[l]aw is a solemn expression of legislative will" and is interpreted to mean that legislation is the principal source of law in Louisiana and that doctrine and precedent are merely persuasive. ALBERT TATE, "The New Judicial Solution: Occasions for and Limits to Judicial Creativity," 54 Tu.L.Rev. 877, 885 n. 24 (1980). Interpreting older statutes, particular Napoleonic codifications, may prove difficult, but must not be avoided. *See* SYMEON SYMEONIDES, "Louisiana Conflicts Law: Two 'Surprises' ", 54 L.L.Rev. at 497–98. Thus, the starting point of conflicts analysis relevant in 1986 is article 10:

> The form and effect of public and private written instruments are governed by the laws and usages of the places they are passed or executed.

> But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

La.Civ.C. art. 10, (1986).

The purpose of article 10 is no longer discovered in the literal intent of the drafter, but in the social objectives of the legal provision. Interpretation founded on the "objectives of the rule" is based on the idea that "the meaning of the statute changes with time, because it is destined to be applied to conditions existing today, and not to those existing in the more distant past." The text must then be interpreted in relation to the needs of society prevailing at the time of the interpretation. REIG, "Judicial Interpretation of Written Rules," 40 La.L.Rev. 49, 63–64 (1979).

The second paragraph of article 10 requires that the "effects" of a contract be governed by the laws of the place where the contract is "to have effect." This place of effect need not automatically be equated with nor limited to the place of execution or performance; it can be, and has been, construed to mean the state which is in some manner the most relevant to a particular issue. KARAM, "Conflict of Laws—Contracts," 47 La. L.Rev. 1181, 1199 (1987); *see also Bell v. State Farm Mutual Automobile Insurance Co.,* 680 F.2d 435 (5th Cir.1982)( [regarding analysis under Article 10], "[i]n the case of an insurance policy issued in one state on an

automobile that within reasonable intention will be operated in interstate travel, the law of the forum state in which the accident occurs may be deemed to be the state in which the policy was intended to have effect and to have the most significant relationship .... " (underline added, cites omitted)).

Judge Tate, sitting on the Louisiana Court of Appeal for the Third Circuit, used this type of "re-interpretive" analysis in concluding that Louisiana law determined the rights of an Indiana creditor on a contract executed in Indiana for the purchase of an automobile to be used in Louisiana by a Louisiana resident. *See generally Universal C.I. T. Credit Corp. v. Hulett,* 151 So.2d 705 (La.App. 3rd Cir.1963).

The seminal case in Louisiana on modern choice of law pre-codification analysis is *Jagers v. Royal Indemnity Co.,* 276 So.2d 309 (La.1973). There the Supreme Court refused to apply Mississippi law, even though the accident occurred in Mississippi, in a direct action suit brought by a Louisiana resident against her son and his liability insurer. In rejecting the traditional *lex loci delictus* standard, the Court's use of modern conflicts "jargon" such as "state interests" and "false conflicts" was a clear indication that the court was thinking in terms of a methodology known as "governmental interest analysis." SYMEON SYMEONIDES, "Louisiana Conflicts Law:" "Two Surprises," 54 La.L.Rev. at 498. As observed by another commentator, traditional conflicts rules such as *lex loci delicti* and *lex loci contractius* had proven inadequate in their failure to take into account the interests of all the involved states. MICHAEL W. MENGIS, "Conflict of Laws: Insurance", 47 La.L.Rev. 1213, 1213 (1987).

As a result of *Jagers,* Louisiana courts began to turn to modern choice of law methodologies including "interest analysis" to resolve conflicts problems by evaluating the competing concerns of all involved states. In *Sutton v. Langley* 330 So.2d 321 (La.App. 2d Cir.), *writ denied,* 332 So.2d 805 (La.1976), the Second Circuit extended the rationale of *Jagers* to insurance law. A Texas resident brought suit against a Louisiana resident for injuries sustained in an automobile accident in Louisiana. Joined as a defendant was the plaintiff's Texas uninsured motorist carrier. At issue was the applicability of Louisiana's "stacking" of UM coverage. In finding that Louisiana law applied, the court noted that Louisiana's interest in regulating awards to persons injured on its highways, protecting those using its highways from damage by uninsured motorists, and equally assessing the burden of those awards to all culpable parties outweighed Texas' interest in assuring low rates of insurance for coverage written in Texas. *Id.* at 328.

The Fifth Circuit was sensitive to the shift in Louisiana to the modern conflicts analysis. In *Bell v. State Farm Mutual Automobile Insurance Co.,* 680 F.2d 435 (5th Cir.1982), the issue was what state's law applied to the interpretation of an insurance policy issued to a Florida resident in Florida for injuries he caused to a Louisiana resident in Louisiana while the Floridian was stationed at a military base in Louisiana. Judge Tate wrote for the panel stating that "[t]he *lex loci contractus* interpretation" of Louisiana Civil Code Article 10 ... is not in accord with the later jurisprudential interpretations that the application of insurance policies in Louisiana tort cases is governed by the interest analysis of *Jagers v. Royal Indemnity* and its progeny, *See* Couch, "Louisiana Adopts Interest Analysis: Applause and Some Observations," 49 Tul.L.Rev. 1 (1974), and followed by subsequent decisions of this circuit, *e.g. Lee v. Hunt* 631 F.2d 1171 (5th Cir.1980); *Cooper v. American Express,* 593 F.2d 612 (5th Cir.1979); *Brinkley & West, Inc. v. Foremost Insurance Company,* 499 F.2d 928 (5th Cir.1974)." *Bell v. State Farm Mutual Auto. Ins. Co.,* 680 F.2d at 436.

In 1982, Judge Rubin, writing for the panel in *Stickney v. Smith,* 693 F.2d 563 (5th Cir. 1982), held that Louisiana law applied to an insurance coverage dispute on a policy issued in Michigan to a Michigan domiciliary who was serving military duty in Louisiana when he was killed in an automobile accident here. The court stated that "we have recently analyzed Louisiana decisions and conclude that Louisiana no longer automatically applies the law of the place where a contract is made, *lex loci contractus,* to determine the validity and

interpretation of a contract, but instead determines the applicable law by a process known as 'interest analysis'." *Id.* at 564. The Court noted policy considerations stating that "the financial resources of Louisiana residents, Louisiana public hospitals, and other state facilities will likely be called upon if insurance coverage does not provide funds for their uses." *Id.* at 564 (citing *Jagers and Sutton* as controlling state cases for insurance contract interpretation pursuant to direct actions); *see also Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.,* 846 F.2d 319, 321 (5th Cir.1988)("When applying Louisiana conflicts of law principles, this Court has noted that article 15 [the renumbered article 10] is not to be applied literally ... [the proper conflict analysis is] Louisiana's choice of law interest analysis").

## IX

■ Louisiana's "interest analysis" is a two-step process. First is the determination of whether a true or false conflict exists. *Sandefer Oil & Gas, Inc. v. AIG Oil Rig, Inc.,* 846 F.2d 319 (5th Cir.1988) (citing *Jagers v. Royal Indemnity Co., supra* ). If only one state has an interest then a false conflict exists, and the law of the solely interested jurisdiction controls. Alternatively, if two or more states have an interest, then the court reaches the second step and applies the Second Restatement's "most significant relationship" approach. *Gates v. Claret,* 945 F.2d 102, 103 (5th Cir.1991), *see Restatement (Second) of Conflict of Laws* §§ 6, 193 comment (b), and § 188 (1971).

The test for whether a state has an "interest" under the governmental interest analysis is described in *Sandefer, supra:* "If the state's relationship to the dispute is within the state's policy, then the state has a legitimate 'interest' in the application of its law to resolve the dispute." *Sandefer,* 846 F.2d at 322. The Restatement (Second) "Most Significant Relationship" test directs the court to consider the following contacts:

(a) place of contracting

(b) place of negotiating the contract

(c) the place of performance

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement (Second) of Conflict of Laws § 188 (1971).

Louisiana has a legitimate interest in this dispute. The state's relationship to the dispute is three-fold: 1) the alleged tort victims; 2) the insureds; and 3) the site. In all three instances, the Legislature has spoken and it is the law of this civilian jurisdiction.

In addition to the statement that liability insurance is issued "for the benefit of all injured persons"—the alleged tort victims, the Legislature declares in the Direct Action Statute that it is the purpose of all liability policies to give protection and coverage to all insureds, "whether they are named or additional insureds under the omnibus clause, for any legal liability said insured ... may have as, or for, a tortfeasor ...". La. R.S. 22:655(D); *Norton v. Lewis,* 623 So.2d 874, 875 (La.1993). This law is designed to prevent insurers from using [the law of another state to interpret a term or phrase in the insurance contract) so to evade the fundamental purpose of the insurance contract and to assure payment of liability claims up to the policy limits. *Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.,* 846 F.2d 319 (5th Cir.1988)(citing *Champion v. Panel Era Mfg. Co.,* 410 So.2d 1230, 1237 (La.App. 3d.Cir.1982). Thus, in addition to protecting the victim, it is also the policy of Louisiana to protect the state's business—the insureds, whether domiciliaries or long-time residents, who have paid insurance premiums for risks incurred in Louisiana such as the one presented by this case. The interest of the State of Louisiana and of these insureds are identical—the financial stability of businesses who pay for insurance to cover business risks in this state.

While the insurers correctly point out that the "named insured" on some of the policies may have been a parent corporation domiciled in a foreign state, the business operation that was insured in all cases was a well-established Louisiana business. Avondale has operated a shipbuilding business in south

Louisiana since 1938, employing 5000–10,000 Louisiana residents at all times. In 1991, Avondale became a wholly-owned Louisiana corporation. It is one of the largest private employers in Louisiana. The Dubose entities and Combustion, Inc.—operated in Livingston Parish for over 16 years. Ferro Corporation, later Grant Chemical, operated a plant just north of Baton Rouge; MacKenzie Chemical is located in St. Tammany Parish; Port Allen Marine Services, Inc. operated at the Port of Baton Rouge during the relevant period; Reichhold Chemical operated a facility in Oakdale, Louisiana: Younger Brothers, Inc. owned and operated three trucking terminals in Louisiana and has done business in the state for more than 30 years; Canal Refining operated gasoline stations in Louisiana; and Williams–McWilliams owned and operated its facility in Morgan City, Louisiana. In each case, these insureds' contacts with the state of Louisiana are significant.

The third prong of the state's relationship to the dispute is that the site itself is in Louisiana. For almost twenty years waste materials and toxic chemicals generated in Louisiana were brought to Livingston Parish by these Louisiana businesses. Millions of gallons of hazardous materials were dumped at the Dubose–Combustion site. Fires, floods and waste spills exacerbated the problems at the site. The Louisiana Legislature has spoken clearly, and it is the law of this civilian jurisdiction, regarding the state's serious concern over its environment and the related health and safety of its residents and on the disposal of hazardous waste. The public policies of this state regarding the protection of its residents, protection of its businesses, and protection of its environment support the finding that the State of Louisiana has a genuine interest in this dispute.

Finally, but significantly, the burden of this environmental disaster has been a heavy one to bear for the community of Livingston Parish. Effectively the entire parish population is included in the class definition; over 14% of the parish population has filed proofs of claim. Members of the Plaintiffs' class have died or face increasing medical problems with bleak prognosis, allegedly caused by exposure to the toxic chemicals at the site.

Louisiana's public medical facilities must provide care. Livingston Parish is one of the more rural parishes in the state, and its business reputation has suffered as a result of it being the location of a Superfund site. State regulatory officials have been involved with the Dubose–Combustion, Inc. site for over ten years and continue to be involved today. The interests of the State of Louisiana in this dispute run true and deep.

■ On the other hand what interest does a foreign state have in this dispute, where only a parent corporation of a Louisiana business is domiciled in that foreign state. In most instances, the insureds are no longer a party to this dispute, having already reached a compromise with the Plaintiffs. Regardless, another state has no interest in asserting its laws to interpret an insurance contract entered into by its domiciliary, where its domiciliary will be protected and will benefit at least as much if not more by the application of Louisiana law to its contract. For example, the state of Texas should have no interest in applying its laws to the relevant insurance contract if the result is financially devastating to its domiciliary has who operated a long-standing business in Louisiana, particularly if under Louisiana law, the insured's business interest would be more protected. The insurers would like to isolate the choice of law issue into simply a matter of applying the law of the state where the insured is domiciled. The focus and extent of their argument is on the parties to the contract and the place where the administrative activities related to the contract took place. This narrow analysis does not comport with civilian methodology, nor does it take into account the policy considerations expressed in the insurance and environmental codes. Foremost, the insurers' analysis ignores the interests of the victim. These direct actions are brought by the *tort victims* by virtue of right that vests at the time of the injury. While they are not a party to the contract, they are certainly a party to the suit.

The insurers do not help themselves by repeatedly arguing that Louisiana has no interest in this dispute because the site has already been remediated by the solvent in-

sureds. Aside from the factual inaccuracy of the statement because of the looming possibility of ground water contamination, the issue front and center is insurance coverage for tort victims. It is the opinion of this Court that the state of Louisiana could not have articulated any more succinct, urgent statement than those policy statements in the insurance and environmental codes quoted above.

The *only* state with a true interest in this litigation is the State of Louisiana. When the foreign state has no interest in the application of its laws in Louisiana litigation, we deem that the application of Louisiana law by the Louisiana courts will contribute much greater predictability, certainty and constancy to the law. *Jagers v. Royal Indemnity Company,* 276 So.2d 309, 312 (La.1973). This analysis comports with the "re-interpretive" reading of article 10 of the Code of 1825, since the place where the insurance policies are to have effect is Louisiana.

This Court finds that under the pre-codification of choice of law analysis, a false conflict exists. Louisiana is the only state with an interest in this dispute, and Louisiana law controls actions pursuant to the Direct Action Statute.

## X

The Court's analysis under the old and the new conflict of laws articles yields the same result. The proper analysis after January 1992, begins with Civil Code article 14, which replaced the old articles 14 and 15. Article 14 instructs that if not "expressly provided by the laws of this state, cases having contacts with other states are governed by the law selected in accordance with the provisions of Book IV of this Code." First, the Louisiana Insurance Code provides incite though is not dispositive. Specifically, La. R.S. 22:629 prohibits an insurance contract from containing a clause mandating the law of another state:

> [n]o insurance contract delivered or issued for delivery in this state and covering subjects, located, resident, or to be performed in this state ... shall contain any condition, stipulation, or agreement:

(1) Requiring it to be construed according to the laws of any other state . . . . .

\*    \*    \*    \*    \*    \*

By contending that the insurance contracts be interpreted by the law of the domicile of the insured, the insurers seem to be trying to do indirectly what they are prohibited from doing directly, i.e. imposing the requirement that the insurance contract be construed under the law; of a foreign state. The analysis could not stop here because there has been no showing that every insurance contract at issue was delivered or issued for delivery in the state.

The analysis in Book IV begins with article 3544, issues pertaining to loss distribution and financial protection, and provides for the law of the state where the injured person and the injuring person are domiciled if they are domiciled in the same state, La. Civ. C. art. 3544(1), or the law of the state where both the injury and the conduct that caused it occurred, La. Civ. C. art. 3544(2).

In addition to loss distribution, this conflict of law problem is one of insurance coverage, and therefore one of contract. *Levy v. Jackson,* 612 So.2d 894, 896 (4th Cir.1993)(pending on appeal). The general and residual article on contract conflicts is art. 3537, which states clearly that "the state whose policies would be most seriously impaired," that is, the state that, in light of its connection to the parties and the transaction and its interests implicated in the conflict, would bear the most serious legal, social, economic, and other consequences "if its laws were not applied" to the issue at hand. SYMEON SYMEONIDES, "Louisiana Conflicts Law: Two Surprises", 54 La.L.Rev 497 (1994). Under article 3537, the search for the applicable law should be based on an objective and impartial evaluation of the consequences of the choice-of-law decision on each of the states involved. *Id.* at 523. The search should not be a mechanical, quantitative process. *Id.* The pertinence of tie policy considerations is to be made "in the light of the nature, type, and purpose of the contract." *Id.* Another factor given strong consideration is the expectation of the parties, meaning risks covered and premiums paid. *Levy v. Jackson,* 612 So.2d at 897.

In *Levy,* an Alabama victim brought a direct action against an Alabama insured and his Alabama insurer for injuries she received while in Louisiana as a result of negligence by the insured. Under Louisiana law, the insured was vulnerable to suit, while under Alabama law, he was immune. The court determined that the proper conflict analysis in a case involving this direct action should begin with article 3544 but should also include article 3537. The Fourth Circuit's opinion was noted by Professor Symeonides, the reporter for Book IV, as an example of a Louisiana court's proper analysis under article 3544. *See generally* SYMEONIDES, "Louisiana Conflicts Law: Two Surprises", 54 La.L.Rev 497 (1994).

This Court's analysis in the case at bar includes both articles 3544 and 3537, as neither article is an exact fit, but together they evaluate the essential interests of the direct action. Applying article 3544 to the case at bar, this Court concludes that Louisiana law controls. The injured parties are domiciled in Louisiana and the conduct-causing the injury occurred in Louisiana. La.Civ.C.art. 3544(2).

The analysis continues under article 3537. Professor Symeonides advises in the comments that when applying article 3537, factual contacts listed in clause (1) such as "the place of negotiation, formation, and performance of the contract, location of the object, . . . place of domicile, habitual residence, or business of the parties," are neither exhaustive nor hierarchical and are intended to discourage rather than encourage a mechanistic counting of contacts as a means of selecting the applicable law. He suggests that the nature or type of contract may result in one contact being more important than all other factual contacts of another state, "if the issue in dispute is such as to bring into play a strong policy" of one state. La. Civ. C. art. 3537, comment (e). In the case at bar, this analysis turns on the overwhelming influence of one contact above all others—the location of the risk, certainly an important contact on a liability contract. Louisiana was the bullseye, the terminal stop for almost 20 years and for millions of gallons of waste disposal generated by hundreds of Louisiana businesses. The Louisiana site was nationally marked as the worst type of environmental atrocity by being named a Superfund site. The location of the risk dominates all other contacts with the contract.

Equally as interesting is the analysis set out by Chief Judge Sear of the E.D. of La. regarding the relationship between a direct action and the choice of law analysis. In *Naquin v. Prudential Assurance Co., Ltd.,* 1993 WL 177198 (E.D.La.1993), where the injured parties brought a direct action against several insurers triggering "the interests of multiple states". *Id.* at *1. Chief Judge Sear addressed the choice of law dispute by saying that "[a]lthough the interests of multiple states are involved in this case, the issue of conflicts of laws is moot. Louisiana, Mississippi, Texas, and England have a potential interest in this case. (footnote omitted). However, none of the foreign states provide plaintiffs with a remedy. (cites omitted). Plaintiffs only recourse lies in Louisiana law under the Louisiana Direct Action Statute." *Id.* at *1. *Naquin* supports the conclusion reached by this Court.

The insurers argue that the factual contacts should control the analysis under article 3537, "the place of negotiation, formation, and performance of the contract, . . . place of domicile, . . ., or business of the parties," La.Civ.C. art. 3537, and they cite several cases in support of this position. Four of the cases were actions between the insured and the insurer, making the dynamics of the dispute significantly distinguishable from the case at bar. *Breese v. Hadson Petroleum,* 947 F.Supp. 242 (M.D.La.1996)(insured and insurers cross-motions where before the court); *Resure, Inc. v. Chemical Distributors, Inc.,* 927 F.Supp. 190 (M.D.La.1996)(insurer's motion for summary judgment in a suit seeking declaratory judgment that it had no duty to defend or indemnify the insured); *Gill v. Matlack, Inc.,* 671 So.2d 395 (La.App. 1st Cir.1995)(appeal of dispute between Matlack, insured, and Liberty Mutual Insurance Co, its insurer); *Wyatt v. Martech U.S.A.,* 1995 WL 562336 (E.D.La.1995)(Plaintiffs are representatives of certain Underwriters at Lloyds, defendant is Insurance Company of North America, and before the court is a

motion by Lloyds for reimbursement from INA on claims already paid to tort victims). A direct action is not before any of these courts. These cases are not applicable to the situation at hand.

Insurers cite two cases that involve direct actions. In *Holcomb v. Universal Insurance Co.,* 640 So.2d 718 (La.App. 3rd Cir.1994), Arkansas domiciliaries also victims brought a direct action against their Arkansas uninsured motorist carrier for injuries sustained in an automobile accident occurring fortuitously in Louisiana. The court applied a choice of law analysis under articles 3537 in deciding that Arkansas law controlled the action. Clearly the only interest the state of Louisiana had in this dispute was providing the Arkansas residents the procedure with which to sue their own Arkansas insurer directly. The facts of *Holcomb* are distinguishable from the facts of the case at bar in every way, but the case is illustrative of an analysis under Louisiana conflicts articles in which the factual contacts of another state are so compelling as to drive the determination that a foreign law controls. Similarly, in the case at bar, the facts are equally as compelling that Louisiana law must control.

In *Anderson v. T & D Machine Handling, Inc.,* 1996 WL 518140 (not reported in F.Supp.)(E.D.La. September 9, 1996), the court considered a motion for summary judgment on a direct action filed by the victim against the tortfeasor's insurer. Again, critical facts are distinguishable. Unlike the instant case, in *T & D,* the Louisiana victims were injured by a tortfeasor who was fortuitously doing business in the Louisiana, having no other connections to the state. The tortfeasor's business was "nationwide in scope, it ha[d] no offices or employees within the State of Louisiana." *Id.* at *1. The court also emphasized the fact that the tortfeasor's insurer was an out-of-state company, a fact that the insurers in the case at bar concede is not relevant to their argument.

For all of the reasons discussed above, this Court concludes that under the post-codification analysis, Louisiana law governs. Accordingly, this Court finds that Louisiana law governs all actions in the case brought pursuant to the Louisiana Direct Action Statute.

XI

■ Having arrived at the results-oriented law of the site approach for direct actions, this Court now addresses the choice of law to govern all other actions before the Court, *Attachments C & D,* and finds that the law of the site approach most appropriately suits all tile remaining actions.

The analysis of this Court comports with the proposal of the American Law Institute Project concerning the resolution of the choice of law issue in comprehensive environmental insurance coverage. PETER KALIS, JAMES SEGERDAHL, JOHN WALDRON, "The Choice of Law Dispute in Environmental Coverage Litigation: Has Help Arrived from the American Law Institute Complex Litigation Project?" 54 La. L.Rev. 925, 938. The Project consists mainly of two separate guidelines for the determination of choice of law in comprehensive environmental litigation—one approach for "mass tort" and another for "mass contract." The stated goal of the Project is to provide a procedural solution to the choice of law determination that fosters a fair, just, and efficient resolution of complex cases. *Id.* at 939.

Of particular interest is the Project's application of its analysis to comprehensive insurance coverage actions, a two-step process. *Id.* at 945. The Project summarized the analysis saying that "we will first consider choice of law in a comprehensive insurance coverage case under the [the Project's] rules for comprehensive contract cases. Next because insurance coverage cases of this type also implicate tort interests, we will consider the choice of law problem in comprehensive insurance coverage cases by applying the [Project's] rules for mass tort cases." *Id.* at 945.

In both instances, under the facts of the case at bar, the conclusion is that Louisiana is the state whose policies would be furthered by the application of its law. The Project's mass contract test is: 1) the place or places of contracting; 2) the place or places of performance; 3) the location of the subject matter of the contract; and, 4) the primary places of business or habitual residences of

the plaintiffs and the defendants. *Id.* at 946. Under this analysis of the facts in the instant case, Louisiana satisfies three of the four parts, 2, 3 & 4, with the first inquiry resulting in nominating the interests of 8 other states.

The second part of the Project's analysis is the approach to choice of law for mass tort cases. The test is: 1) the place or places of the injury; 2) the place or places of the conduct causing the injury; and 3) the primary places of businesses or habitual residences of the plaintiffs and defendants. *Id.* at 947. In this analysis, Louisiana prevails on all three prongs of this test as the state whose policies would be furthered most by the application of its laws. Members of the Project are not optimistic that application of the Project's analysis will yield a perfect fit to the elements of each test, particularly where comprehensive insurance coverage cases require both tests. However, the results in the instant case are certainly conclusive if not overwhelming in support of the law of Louisiana and confirm the results reached by this Court's analysis under Louisiana's conflicts articles: Louisiana law governs this case.

In so finding, this Court holds firm to the notion that one body of law should govern the interpretation of a single contract subject to multiple disputes, for instance the suits of the insured and the Plaintiffs against the insurer on the same contract. This holding is certainly not tantamount to coverage. However, this Court firmly believes that under tile facts of this case, should insurance coverage that has been paid for by the insured be denied, it must be done so under the law of the State of Louisiana.

For all of these reasons this Court adopts the law of the site approach for the analysis of the contract disputes involving both the insured and the Plaintiffs against the insurer and for the contract disputes involving only the insured and the insurer.

## XII

Avondale sued Travelers Indemnity in New York for a declaratory judgment for defense costs and indemnity related to the litigation in Louisiana, the "Combustion" litigation. That court ruled that Travelers must pay Avondale's cost to defend the tort suit and Administrative proceedings. However, the New York court refused to rule on indemnification. In 1992 the New York action was stayed, and in 1995 the action was transferred to and consolidated with the Combustion litigation.

Meanwhile Travelers and Avondale had already been named as parties to Combustion, Avondale as a tort defendant and Travelers as a direct action defendant. Combustion proceeded in line with its Case Management and Scheduling Order, and in accordance with the Order of the Court, Avondale, along with all other defendants and third party defendants, filed cross-claims against its insurers for indemnity. The January 8, 1997 Order of this Court DENIED Avondale's Insurers' Motion to Dismiss Avondale's Cross-claims.

Thus, the choice of law dispute between Fravelers and Avondale currently before the court is exclusively an outgrowth of petitions and motions filed in Combustion. The dispute is not a continuation of the New York Litigation in anything more than in spirit, because the stay in the New York litigation has never been lifted. Therefore, an additional and distinct analysis to address claims between Avondale and Travelers and, oddly, American Motorists Insurance Company (AMICO) and Avondale—though Avondale did not sue AMICO in New York, as requested by Travelers and AMICO, is not necessary. Furthermore, the New York action will become res judicata to this litigation after a determination of the merits of this case.

## XIII

For all the reasons discussed above, this Court hereby GRANTS the following Motions:

-Motion by Plaintiffs Class Regarding Choice of Law

-Motions by Port Allen Marine Services, Inc. against Fidelity & Casualty and The Home Insurance Co.

-Motion by Younger Bros. against Employers Insurance of Wausau

-Motion by Younger Bros. against Underwriters at Lloyds

-Motion by Avondale Industries on Choice of Law

and DENIES the following Motions:

-Motion by Certain Insurers Regarding Choice of Law filed by the Insurers listed in Attachment A.

-Motions filed by Insurers listed in Attachment C.

-Motions filed by Insurers listed in Attachment D.

### Attachment A

Insurers joining in the Motion of Certain Insurers Regarding Choice of Law

The Travelers Indemnity Company

Aetna Casualty & Surety Company

Constitution State Insurance Company

The Charter Oak Fire Insurance Company

AIU Insurance Company

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

Lexington Insurance Company

National Union Fire Insurance Company of Pitts., PA

New Hampshire Insurance Co.

Royal Indemnity Company

Royal Insurance Company of America

Reliance Insurance Company

Compass Insurance Company

Bellefonte Underwriters Insurance Company

Highlands Insurance Company

St. Paul Guardian Insurance Company

Truck Insurance Exchange

Carolina Casualty Insurance Company

Transport Insurance Company

Louisiana Insurance Guaranty Association

Employers Mutual Casualty Company as alleged insurer of Avondale Industries, Inc.

Everest Reinsurance Company as alleged insurer of Avondale Industries, Inc.

Gibraltar Casualty Company as alleged insurer of Avondale Industries, Inc.

Everest Reinsurance Company as alleged insurer of Reichhold Chemicals, Inc.

Carrier Insurance Company Limited

Century Indemnity Company

United States Fidelity and Guaranty Company

The Home Insurance Company

Employers Insurance of Wausau

Auto Owners Insurance Company

ERIC Reinsurance Company

A.C.E. Insurance Company

International Insurance Company

### ATTACHMENT B
### CHOICE OF LAW CHART

| INSURER/ INITIAL BRIEF | INSURED/ NAMED INSURED | ACTION | LAW: INSURER |
|---|---|---|---|
| Aetna Casualty & Surety Co | Avondale Industries, Inc./Avondale Shipyards/Ogden Corp. | direct action and contract | New York |
| Eric Reins. Co. | Avondale Industries, Inc./Avondale Shipyards/Ogden Corp. | direct action and contract | New York |
| Employers Mutual Casualty Co. | Avondale Industries, Inc./Avondale Shipyards/Ogden Corp. | direct action and contract | New York |

1074

| | | | |
|---|---|---|---|
| Everest Reins. Co. f/k/a Prudential Gibraltar Casualty Co. | Avondale Industries, Inc./Avondale Ship- yards/Ogden Corp. | direct action and contract | New York |
| Granite State Ins. Co. The Home Ins. Co. Lexington Ins. Co. National Union Fire Ins. Co. of Pittsburgh, Pa. New Hampshire Ins. Co. | Avondale Industries, Inc./Avondale Ship- yards/Ogden Corp. | direct action and contract | New York |
| International Ins. Co/Int'l Surplus Lines Ins. Co. (ISLIC) | Avondale Shipyards, Inc. | direct action and contract | New York |
| Underwriters/Lloyds | Avondale Industries (Ogden) | direct action and contract | New York |
| Continental Insurance Co. | Avondale Industries, Inc. | direct action and contract | New York |
| Travelers Indemnity Company | Avondale Industries, Inc. | direct action and contract | New York |
| American Motorists Insurance Company | Avondale Industries, Inc. | direct action and contract | New York |
| Stonewall Ins. Co. | Canal Refining Co. | direct action | Oklahoma |
| Stonewall Ins. Co. | Combustion, Inc. | direct action | Mississippi |
| Ranger Ins. Co. | Combustion, Inc. | direct action | Mississippi |
| Charter Oak Fire Ins. Co. | Combustion, Inc./H.A. Gammons | direct action | Mississippi |
| Auto–Owners Ins. Co. | Dubose Oil Products Co. | direct action | Florida |
| New Hampshire Ins. Co. | Dubose Oil Products Co. | direct action | Mississippi |
| Travelers Indemnity Co. | Dubose Entities (Recovery Systems, Inc. policy) | direct action | Mississippi |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | Ferro Corp./Cataphote, Inc. | direct action | Ohio |
| Royal Ins. Co. of America | Ferro Corp./Cataphote, Inc. | direct action | Ohio |
| Transportation Ins. Co. | Ferro Corp./Cataphote, Inc. | direct action | Ohio |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | Grant Chemical | direct action | Ohio |
| Royal Ins. Co. | Grant Chemical | direct action | New Jersey |
| St. Paul Guardian | Mackenzie Chemical | direct action | New York |
| Aetna Casualty & Surety Co. | Port Allen Marine Services | direct action & contract cov. | Massachusetts |
| The Home Ins. Co. | Port Allen Marine Services (Eastern Gas & Fuel) | contract cov. | Massachusetts |
| Century Indem. Co. | Port Allen Marine Services | direct action & contract cov. | Massachusetts |

| | | | |
|---|---|---|---|
| Fidelity & Casualty Co. of N.Y. | Port Allen Marine Services | contract cov. | Ohio |
| Royal Indemnity Co. | Reichhold Chemicals, Inc. | direct action | New York |
| Everest Reins. Co. f/k/a Prudential | Reichhold Chemicals, Inc. | direct action | New York |
| Century Indem. Co. | Reichhold Chemicals, Inc. | direct action | New York |
| American Home Assur. Co. Granite State Ins. Co. Lexington Ins. Co. National Union Fire Ins. Co. of Pittsburgh, PA | Reichhold Chemicals, Inc. | direct action | New York |
| Carrier Ins. Co., Ltd. | Williams–McWilliams Co., Inc. | direct action | Texas |
| Compass Ins. Co. | Williams–McWilliams Co., Inc. | direct action | Texas |
| Bellefonte Underwriters Ins. Co. | Williams–McWilliams Co., Inc., | direct action | Texas |
| Carolina Casualty Co. | Younger Brothers | direct action & contract cov. | Texas |
| Employers Ins. of Wausau | Younger Brothers | contract cov. | Texas |
| Transport Ins. Co. | Younger Brothers | direct & contract cov. | Texas |
| Underwriters/Lloyd's | Younger Brothers | contract cov. | Texas |

---

## Attachment C

**Contract dispute only, between the insurer and the insured**

Fidelity & Casualty Co. of N.Y. for Port Allen Marine Services, Inc.

The Home Ins. Co. for Port Allen Marine Services, Inc.

Employers Ins. of Wausau for Younger Brothers, Inc.

Underwriters at Lloyds for Younger Brothers, Inc.

## Attachment D

### Direct Action and Contract Disputes

| Insured | Insured | Plaintiffs |
|---|---|---|

Aetna Casualty for Port Allen Marine Services, Inc. and the Plaintiffs

Century Indemnity Co. for Port Allen Marine Services, Inc. and the Plaintiffs

Carolina Casualty Co. for Younger Brothers, Inc. and the Plaintiffs

Transport Insurance Co. for Younger Brothers, Inc. and the Plaintiffs

Aetna Casualty & Surety for Avondale Industries and the Plaintiffs

Eric Reinsurance Co. for Avondale Industries and the Plaintiffs

Employers Mutual Casualty Co. for Avondale Industries and the Plaintiffs

Everest Reins. Co. for Avondale Industries and the Plaintiffs

Gibraltar Casualty for Avondale Industries and the Plaintiffs

Granite State Ins. Co. for Avondale Industries and the Plaintiffs

The Home Ins. Co. for Avondale Industries and the Plaintiffs

Lexington Ins. Co. for Avondale Industries and the Plaintiffs

National Union Fire Ins. Co. of Pittsburgh, Pa. for Avondale Industries and the Plaintiffs

New Hampshire Ins. Co. for Avondale Industries and the Plaintiffs

International Ins. Co. for Avondale Industries and the Plaintiffs

Underwriters at Lloyds for Avondale Industries and the Plaintiffs

Continental Insurance Co. for Avondale Industries and the Plaintiffs

Travelers Indemnity for Avondale Industries and the Plaintiffs

American Motorists Insurance Company for Avondale Industries and the Plaintiffs