STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

ALWYN J. BOUTTE, SR.

VERSUS

FIREMAN'S FUND COUNTY MUTUAL INS. CO., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20014596
HONORABLE JOHN DAMIAN TRAHAN, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and J. David Painter, Judges.

**REVERSED AND REMANDED.**

Lawrence N. Curtis
Curtis & Lambert
P. O. Box 80247
Lafayette, LA 70598-0247
Telephone:  (337) 235-1825
COUNSEL FOR:
        Plaintiff/Appellant - Alwyn J. Boutte, Sr.

Michael Paul Bienvenu
Seale, Smith, Zuber & Barnette
8550 United Plaza Boulevard - #200
Baton Rouge, LA 70809
Telephone:  (225) 924-1600
COUNSEL FOR:
        Defendants/Appellees - Eva Bernal and Fireman's Fund County
        Mutual Insurance Company

**James Paul Doherty**
**Voorhies & Labbe'**
**700 St. John Street**
**Lafayette, LA 70502-3527**
**Telephone: (337) 232-9700**
**COUNSEL FOR:**
**Defendant/Appellee - Eva Bernal**

THIBODEAUX, Chief Judge.

Plaintiff, Alwyn J. Boutte, Sr., was injured and his guest passenger was killed when Boutte's vehicle was hit from behind and burst into flames. Boutte sued the lessee, Eva Bernal, a Texas resident, and the insurer of the Ford van that hit him, Fireman's Fund County Mutual Insurance Company ("Fireman's Fund"). Boutte subsequently amended his petition to add the driver and the passenger of the van, both Texas residents. Both defendants filed motions for summary judgment, arguing that they had no liability because the driver of the van was not driving the van with Bernal's permission, the driver was not an employee of Bernal at the time of the accident, and the driver was an excluded driver under Texas law. The trial court first granted the motion for summary judgment of Bernal in 2003, and in 2005 the trial court granted the motion for summary judgment of Fireman's Fund. Boutte filed this appeal. For the following reasons, we reverse the judgments of the trial court. There are genuine issues of material fact which remain unresolved. Further, Louisiana, not Texas, law applies which invalidates the named-driver exclusion under this commercial automobile liability policy.

I.

## ISSUES

We must decide:

(1) whether the appeal of the summary judgment in favor of Eva Bernal is properly before this court;

(2) whether the law of Louisiana or the law of Texas applies in determining insurance coverage in this case; and,

(3) whether the trial court erred in granting summary judgment in favor of Eva Bernal and Fireman's Fund County Mutual Insurance Company.

1

## II.

## FACTS AND PROCEDURAL HISTORY

On the afternoon of March 26, 2001, Alwyn J. Boutte, Sr., a sixty-year-old Louisiana resident, was driving a 1987 Dodge van on Interstate 10 near Lafayette. Boutte stopped behind a Mitsubishi that had stopped due to construction along the highway. While stopped, Boutte was rear-ended by a 1998 Ford van, and Boutte's vehicle burst into flames. Boutte was injured, and his guest passenger was burned to death. The 1998 Ford van (hereinafter "the van") was allegedly being driven by Texas resident Juan Lara who was traveling with Ruben Lara. At the time of the accident, the van was being leased by Eva Bernal, a twenty-three-year-old single mother of four from El Salvador.

Bernal had purchased commercial coverage on the van from Fireman's Fund in Texas. The effective dates of the policy were October 9, 2000 through October 9, 2001, and the liability limit was $100,000.00. Bernal testified that she did not have a driver's license at the time of the accident on March 26, 2001, because she could not read or write English. She testified that she had driven without a license in the past. However, she also testified that she had had a Texas driver's license at one point.

Bernal further testified that, at the time of the accident on March 26, 2001, she had been in business with her brother, Jose Bernal, for about a month, installing and repairing floors and concrete. She testified that they needed help and had to hire people to help them. Then she testified that they hired people only to drive for them. Bernal testified that they had hired Juan Lara and Ruben Lara to drive for them because the Laras could read. However, she testified that she did not know whether they knew any English; she had heard them speak only Spanish.

2

On September 10, 2001, Boutte filed suit against Eva Bernal and Fireman's Fund, alleging that Juan Lara was driving the van with the permission of Eva Bernal and while in the scope of his employment with Eva Bernal.

Eva Bernal filed a motion for summary judgment, attaching an expired work permit card, portions of her deposition, and the insurance policy which contained an endorsement excluding Juan Lara from coverage under the policy. In her motion for summary judgment, Eva Bernal asserted that Boutte's theory of recovery against her was based upon *respondeat superior*, or the vicarious liability of an employer for an employee, and that Juan Lara did not work for her at the time of the accident. At one point in her deposition, Bernal stated that Juan Lara had worked for her for the last time about two weeks before the accident. At another point, she testified that Juan Lara was not her employee at the time of the accident and that he had not worked for her from the time he was taken off of her insurance. However, when he actually worked for her and when or whether he was removed from insurance coverage by Eva Bernal is not clear, as the record contains numerous instances of conflicting information and testimony.

Eva Bernal ostensibly kept no business records whatsoever. In her motion for summary judgment, Bernal stated, "A named driver exclusion removing Juan Lara from Eva Bernal's automobile liability policy was signed by Bernal on October 30, 2000." However, in her deposition, Bernal testified that she and her brother started the business of repairing and installing floors and pouring concrete to repair parking lots in 2001 about a month before the accident on March 26, 2001. She also testified that Juan Lara started working for her about a month before the accident and that he worked for her for about a month. Therefore, the business for which Bernal hired Juan Lara did not exist on October 30, 2000, at the time she alleges to have excluded him from coverage. Additionally, according to Bernal's

3

testimony, Juan Lara did not work for her at the time she alleges to have signed the exclusion naming him as an excluded driver. As the record will reveal, the exclusion itself contains conflicting information and does not contain date information next to the signature line.

The record contains an endorsement wherein Bernal was notified that an additional premium of $624.00 would be added as a 33% surcharge "for drivers Juan Lara and Eva Bernal, due to age and driving record." This endorsement was made effective retroactive to the effective date of the policy, October 9, 2000. However the date typed at the bottom of the form is January 3, 2001. We note again that the January 3, 2001 notification lists the driver, Juan Lara, whom Bernal testified that she hired a month before the accident on March 26, 2001. Yet, Juan Lara was the subject of a surcharge almost three months before the accident.

The named driver exclusion itself, which purports to exclude the driver Juan Lara, is a preprinted form with blanks filled in by hand. All names were handwritten. The top of the form showed an effective date of 10/30/00 that was handwritten, not typed. It contained a date stamp at the bottom bearing the following information on three lines, "Austin Mar 08 2001 Surplus." Handwritten beneath the stamp with an arrow pointing to the stamp was the following, "Re-averaged surcharge eff. 2-8-01, due to receipt date of exclusion. (Back 30 days[)]." Also handwritten on the form was the dollar amount of "$127.00" and the following information: "Endt #5." As previously indicated, there is no date line anywhere near the signature line for the insured to actually date the document that he or she is signing.

The record contains another endorsement made effective on February 8, 2001, which decreases the surcharge from 33% to 23% and indicates a return premium of $127.00 "due to receipt of signed exclusion for Juan Lara." A typed line at the bottom of the form states as follows: "ENDT #5/HWM 05-07-01."

4

The policy contains yet another endorsement in the record indicating an additional premium and surcharge for driver Philipe Castro, "due to driving record." It has an effective date of March 7, 2001, and contains the typed line "ENDT #6/HWM 05-07-01." All of the various endorsements and policy changes regarding the different drivers and different vehicles being covered appear to have effective dates and processing dates, rather than actual dates, and back-dating is evident as well. Therefore, it is impossible to ascertain actual dates with regard to when the changes were requested. However, all of the date information in the policy conflicts with the testimony in Eva Bernal's deposition, which conflicts with itself, regarding when Juan Lara worked for Bernal.

Eva Bernal further testified in her deposition that she could not read, because she had never been to school, but that she could sign her name. The copy of her expired work permit card in the record contains what appears to be her signature. There, the name, EVA BERNAL, is scrawled in capital letters across the card beneath her typed name; it is hand printed, and the letters are unevenly spaced. Bernal at one point in her deposition answered with reference to the exclusion that, "Yes, I signed it." However, the policy exclusion in the record did not contain a signature similar to the one printed in capital letters on the permit card; it did not contain any signature.

Rather, the exclusion contained a line with a large "X" that had been traced over several times. On the line next to the "X" were the handwritten cursive initials "*EBE*," which were connected and written in script, not printed, and there were no spaces between the lettering. Since Bernal testified that she had never been married and that all five of her children had the last name of "Bernal," it is not known why the initials ended in "E." Moreover, it is significant that in her deposition, Bernal specifically testified that she never signed her name using her initials.

Bernal further testified that she talked to Miss Gutierrez, apparently the insurance agent sometimes referred to by Bernal as the notary, at the insurance company about removing Juan Lara after Miss Gutierrez informed her that he had many traffic violations, which would cause her coverage to go up. However, Bernal stated that she did not know whether Juan Lara was actually ever removed. Bernal also testified that she signed a document but, since she could not read, she did not know whether that document was adding or removing Juan Lara from her insurance. She further testified that, "I recall that I signed a document and another one that I gave to him." When questioned about this other document, Bernal testified, "Well the notary called me and told me that it was for him to be able to pay all of the traffic violations [sic] tickets that he had."

In her deposition, Bernal also indicated that she advised Juan Lara that he was not insured and was not to drive any vehicle owned or leased by her. She testified that she did not see Juan Lara or anyone with Ruben when Ruben picked up the van. Bernal testified that Ruben Lara wanted to borrow the vehicle "because there was an automobile he wanted to come look [sic] that he was interested in buying. He wanted to come see it. If I like it, well, I'll bring it back, but he did not tell me that he was coming with someone else." In response to the question about how Ruben planned to get the car back to Texas, she testified, "He was not bringing the money to buy it." Bernal further testified that she did not do business in Louisiana and that neither Juan nor Ruben Lara was in the scope of his employment when the accident occurred. She testified that her brother Jose usually went out and got the customers for their business, using business cards and calling cards. When asked to show a card, she said that she did not have any.

In addition to the numerous instances of conflicting testimony above, in response to a question about when *Juan* last worked for her before the accident,

6

Bernal stated, "Two weeks before and then I did not see him again. I don't know where he is." However, she later stated that the last time she saw *Juan* Lara was *after* the accident. She specifically stated, "When he had the accident, he came over to the house and said what happened. . . . That Ruben Lara had had an accident." Bernal vacillated as to whether *Juan* told her about the accident on the day of, or the day after, the accident, and at one point she gave the specific date of March 29th. At one point, she seemed to be unsure whether *Ruben* was with *Juan* when *Juan* told her about the accident, yet later she was positive that they came together. She testified that the first time she learned of the accident *Ruben* was the one who told her. She also testified that after they told her about the accident, she never saw either of them again.

Bernal testified that she did not learn that *Juan* Lara was the driver until the insurance company informed her of the fact. She stated, "I only called the insurance company and that's when I found out this man was driving." When asked what day she had called the insurance company and had this conversation, Bernal stated, "I do not remember. They called me." She then testified that she did not remember the date and guessed that it was fifteen days or a month after the accident, and she stated, "And I was not the one that called." Bernal testified that she did not know whether Juan and Ruben Lara were related to each other or where they could be located. She testified that they hung out together. She denied that she had ever lived with either of them.

Bernal testified that she stopped installing floors with her brother Jose about two weeks after the accident. Therefore, the business was apparently in existence for about six weeks, since it began about a month before the accident and ended two weeks after the accident. Interestingly, Bernal also testified that Ruben Lara had been employed by her as a driver for about three months. There were other

7

vehicles insured under the subject policy, and Bernal testified that she and her brother had tried to start a previous home repair business but they could not start a company because they did not have a state license or social security numbers, even though Eva Bernal had been working in the United States since 1995. She testified that she had always been paid in cash and always paid her employees in cash. There were no affidavits, depositions or statements of any witnesses attached to Bernal's motion for summary judgment. It referenced her response to an interrogatory, but did not attach the responses.

Boutte argued that Bernal's motion for summary judgment was unsupported except for her own self-serving, conflicting testimony and that the party opposing the motion must have his allegations taken as true and must receive the benefit of the doubt when his assertions conflict with the movant. He pointed out the conflicts in Bernal's own testimony and that there were genuine issues of material fact regarding the employment of Juan Lara. Boutte alleged that Bernal's credibility was at issue and that the trial court was prohibited from making credibility determinations at the summary judgment level.

On August 22, 2003, the trial court signed a judgment granting the motion for summary judgment of Eva Bernal. The record does not contain written reasons for the judgment. The dismissal of Eva Bernal appears to have been based upon the named-driver exclusion and the deposition testimony of Eva Bernal alone wherein she denies the employment of Juan Lara and denies giving him permission to drive the covered automobile. The trial court marked through the paragraph in the judgment that sought to designate it as a final judgment.

Fireman's Fund filed a motion for summary judgment asserting that no coverage existed under the policy issued to Eva Bernal. The motion referenced Exhibit C, an affidavit stating that only one policy was issued to Eva Bernal with

effective dates of October 9, 2000 to October 9, 2001. However the affidavit marked as Exhibit C, which purports to be that of the underwriter, is completely blank with regard to affiant and notary names and dates; it is not signed, not dated, and not notarized. Moreover, every reference in the motion to the affidavit contains a blank line where the affiant-underwriter's name should be.

The motion for summary judgment points to language in the policy and states that Fireman's Fund is liable only if an "insured" is legally condemned to pay damages for bodily injury and property damage caused directly by the insured or for which the insured is vicariously liable. Fireman's Fund argued that the court had already determined that Eva Bernal was not vicariously liable and that the only remaining theory for coverage required that Juan Lara qualify as an insured. Fireman's Fund then pointed to the named-driver exclusion in its policy and argued that the exclusion was enforceable under Texas law, which governed the insurance policy.

The motion for summary judgment of Fireman's Fund relied solely on the exclusion and the deposition of Eva Bernal. It attached no depositions or affidavits or statements of witnesses or police officers in Louisiana, it attached no statement by the Fireman's Fund agent in Texas or the neighbors or relatives of the defendants in Texas, and the record is completely void of any such supporting evidence. While the affidavit referenced as Exhibit C and purporting to be that of the Fireman's Fund underwriter was blank, we were able to locate an unmarked affidavit received by the clerk of court on August 15, 2005, two months after Fireman's Fund filed its motion for summary judgment on June 14, 2005. The affidavit was signed by Darin Freebern in Cook County Illinois, identifying the subject policy and stating that no other policy was issued to Eva Bernal by Fireman's Fund "applicable to any

9

occurence on March 26, 2001." However, the notary block, while signed, contains

the following date information: "this 22 day of 2005 2005."

On August 31, 2005, the trial court signed a judgment granting the

motion for summary judgment filed by Fireman's Fund and dismissed Boutte's case.

Boutte filed this timely appeal. Finding various issues of fact and law in this case,

we reverse both summary judgments by the trial court.

III.

## LAW AND DISCUSSION

### Standard of Review

> Appellate courts review grants of summary judgment *de novo*, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, *i.e.*, whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. *Ocean Energy, Inc. v. Plaquemines Parish Gov't*, 04-0066 (La. 7/6/04), 880 So.2d 1. The movant bears the burden of proof. La. C.C.P. art. 966(C)(2). If the movant meets this initial burden, the burden then shifts to plaintiff to present factual support adequate to establish that he will be able to satisfy the evidentiary burden at trial. *Richard v. Hall*, 03-1488 (La. 4/23/04), 874 So.2d 131, 137. Thereafter, if plaintiff fails to meet this burden, there is no genuine issue of material fact and defendant is entitled to summary judgment as a matter of law. *Id.* This court has recognized that a "genuine issue" is a "triable issue," an issue in which reasonable persons could disagree. *Jones v. Estate of Santiago*, 03-1424 (La. 4/14/04), 870 So.2d 1002, 1006 (citing *Smith v. Our Lady of the Lake Hosp.*, 93-2512 (La. 7/5/94), 639 So.2d 730, 751). Further, this court has defined a "material fact" to be one in which "its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery." *Id.*

*Champagne v. Ward*, 03-3211, pp. 4-5 (La. 1/19/05), 893 So.2d 773, 776-77.

"Summary judgment declaring a lack of coverage under an insurance

policy may not be rendered unless there is no reasonable interpretation of the policy,

when applied to the undisputed material facts shown by the evidence supporting the

motion, under which coverage could be afforded." *Adams v. Thomason*, 32,728, p. 4 (La.App. 2 Cir. 3/1/00), 753 So.2d 416, 420, *writ denied,* 00-1221 (La. 6/16/00), 746 So.2d 965.

## Whether the Dismissal of Eva Bernal is Properly Before the Court

The judgment appealed from dismissed Fireman's Fund via final judgment signed on August 31, 2005. Prior to signing the final judgment, the trial court also signed a judgment on August 22, 2003, granting summary judgment in favor of Eva Bernal and dismissing her from the case. The court specifically declined to designate the judgment dismissing Bernal as a final judgment by marking out the paragraph inserted by her in the judgment for that purpose. Eva Bernal now contends that the interlocutory judgment dismissing her pursuant to her motion for summary judgment is not appealable because that interlocutory ruling is not sufficiently related to the final judgment dismissing Fireman's Fund. She further argues that her dismissal had no impact on Boutte's cause of action against Fireman's Fund. We disagree.

Pursuant to its written policy, Fireman's Fund has argued that it is liable only for "sums an insured legally must pay as damages." Therefore, under the theory of defense asserted by Fireman's Fund, the dismissal of the insured, Eva Bernal, is directly related to the dismissal of Fireman's Fund and does impact Boutte's cause of action against Fireman's Fund. The general principle is that when, an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of adverse interlocutory rulings prejudicial to him in addition to the review of the final judgment on appeal. *Landry v. Leonard J. Chabert Med. Ctr.*, 02-1559 (La.App. 1 Cir. 5/14/03), 858 So.2d 454, *writs denied,* 03-1748, 03-1752 (La. 10/17/03), 855 So.2d 761.

Our courts have held that there are exceptions to this general rule, particularly where writs have been taken and decided and where the doctrine of law of the case applies. However, there is no evidence of a writ application on the dismissal of Eva Bernal, and we find no exception to the general rule in this case. Accordingly, we will review Boutte's assignment of error regarding the dismissal of Eva Bernal in the interlocutory judgment of August 22, 2003.

**The Summary Judgment Dismissals of Eva Bernal and Fireman's Fund**

The Fireman's Fund commercial policy issued to Eva Burnal defined its insureds under the heading of WHO IS AN INSURED as follows:

The following are insureds:

a.    You for any covered auto.

b.    Anyone else while using with your permission a covered auto you own, hire or borrow . . . .

c.    Anyone liable for the conduct of an insured described above . . . .

Boutte's petition alleged that Juan Lara was operating the 1998 Ford van with the permission of Eva Bernal and within the scope of his employment with Eva Bernal at the time of the accident. As previously indicated, Eva Bernal denied both allegations and moved for summary judgment, which was granted in August 2003. Based upon Bernal's deposition testimony and her dismissal in 2003 and based upon the exclusion in the policy, Fireman's Fund moved for summary judgment, which was granted in August 2005. Boutte asserts that it was error for the trial court to grant summary judgment because the defendants failed to carry their burden of demonstrating that there were no material issues of fact regarding the circumstances of Juan Lara's and Ruben Lara's trip to Louisiana and Juan Lara's employment with Bernal at the time of the accident and because, under a choice-of-law analysis, the

12

exclusion relied upon in the policy is unenforceable. Boutte argues that Bernal's only support for her assertions was her own conflicting, self-serving testimony. We agree.

Our jurisprudence provides that a motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. Because the movant has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the party opposing the motion. "The party who defends against the motion for summary judgment must have his properly filed allegations taken as true and must receive the benefit of the doubt when his assertions conflict with those of the movant." *Schroeder v. Bd. of Sup'rs of La. State Univ.*, 591 So.2d 342, 345 (La.1991) (citations omitted).

In the present case, in support of her motion for summary judgment, Eva Bernal attached Boutte's original petition, her own deposition testimony, her expired work permit, and the Fireman's Fund insurance policy with the endorsement excluding Juan A. Lara as a covered driver. As indicated in the factual section above, the deposition of Eva Bernal was riddled with discrepancies and self-conflicting testimony. She contradicted herself repeatedly. She argues that, while her testimony varied as to exactly when Juan Lara stopped working for her, she clearly testified that he was not working for her at the time of the accident. We found nothing clear about her testimony.

Because we are reviewing this case *de novo*, we are not bound by the trial court's discretion. Without supporting testimony or business records or evidence of any kind, we find that numerous issues of material fact exist as to what the relationship was between Eva Bernal and Juan Lara and Ruben Lara; whether Eva

13

Bernal was the employer of Juan Lara at the time of the accident; whether Juan and Ruben Lara's trip to Louisiana was in any way connected to repairing homes or installing flooring here; and whether Eva Bernal otherwise gave Juan express or implied permission as a friend or acquaintance to drive the van at the time of the accident.

In fact, there are no police reports or copies of drivers' licenses in the record at all to indicate who was driving the insured vehicle, who was licensed or not licensed and how many Louisiana violations occurred on the date of the accident. The only solid identification in the record is Boutte's chauffeur's license and his medical records. The testimony of Eva Bernal created more factual issues than it resolved. Moreover, as will be discussed below, Eva Bernal was not entitled to summary judgment as a matter of law. Because Fireman's Fund relied solely on the testimony of Eva Bernal and the exclusion in the policy, our position regarding Fireman's Fund is the same.

**The Fireman's Fund Exclusion and Choice-of-Law Analysis**

Boutte argues that the trial court's reliance on Texas law is misplaced and that the named-driver exclusion in the Fireman's Fund policy is not enforceable because it violates the public policy of Louisiana.

The exclusion in the Fireman's Fund policy indicates that it is a "Business Auto Coverage Form" and contains the following language:

> You agree that none of the Insurance coverage afforded by this policy shall apply while Juan A Lara (The Excluded Driver) is operating a covered auto or any other motor vehicle. You further agree that this endorsement will also serve as a rejection of uninsured/underinsured motorists coverage and personal injury protection coverage while a covered auto or any other motor vehicle is operated by the excluded driver.

14

Boutte argues that Louisiana's public policy regarding liability insurance holds that liability policies are issued "for the benefit of all injured persons" pursuant to La.R.S. 22:655(D). He further argues that, in keeping with that public policy, La. R.S. 32:900(B)(2)(d) limits the circumstances under which coverage may be excluded in a commercial automobile liability policy such as the one at issue in this case.

Louisiana Revised Statutes 32:900 addresses named-driver exclusions in two instances, as follows:

La.R.S. 32:900(L)(1) provides in pertinent part as follows:

> Notwithstanding the provisions of Paragraph (B)(2) of this Section, an insurer and an insured may by written agreement exclude from coverage the *named insured* and the *spouse* of the named insured. The insurer and an insured may also exclude from coverage *any other named person who is a resident of the same household as the named insured* at the time that the written agreement is entered into, and the exclusion shall be effective, regardless of whether the excluded person continues to remain a resident of the same household subsequent to the execution of the written agreement. It shall not be necessary for the person being excluded from coverage to execute or be a party to the written agreement.

(Emphasis added).

La.R.S. 32:900(B)(2)(d) provides:

> An owner may exclude a named person as an insured under a *commercial policy* if the owner obtains and maintains in force another policy of motor vehicle insurance which provides coverage for the person so excluded which is *equal to that coverage provided in the policy for which the person was excluded*. The alternative coverage is required for both primary and excess insurance.

(Emphasis added).

In the present case, the policy is a commercial or business policy. Therefore the applicable statute addressing the exclusion is La.R.S. 32:900(B)(2)(d). Accordingly, under Louisiana law governing named-driver exclusions, the exclusion in the Fireman's Fund policy issued in Texas would not be enforceable in Louisiana

15

because no other coverage was maintained for Juan Lara, pursuant to the affidavit filed in evidence in August 2005. Based upon the clear language in the two subsections above, the Louisiana legislature intended to specifically limit named-driver exclusions for the protection of persons injured on Louisiana highways. In individual policies, the named-driver exclusion is limited to members of the household. In commercial or business policies, the limitation is more severe where the intent is to ensure that excluded drivers are nevertheless covered in another policy of insurance. On the other hand, Texas law differs somewhat.

For example, Texas courts have held that the family member exclusion contravenes the public policy underlying the Texas Motor Vehicle Safety-Responsibility Act to protect all potential claimants from damages because it creates an inequity by stripping family members of coverage while allowing coverage for everyone else. Accordingly, the Texas courts have determined that the even broader named-driver exclusion, which focuses on the risk presented by any individual driver, does not create the same inequitable effects as the family member exclusion. *See Zamora v. Dairyland County Mut. Ins. Co.,* 930 S.W.2d 739 (Tex.App. 13th Dist. 1996). In so doing, Texas has actually increased allowable exclusions in individual policies. With regard to the commercial policy at issue herein, Fireman's Fund argues that the exclusion is enforceable, and we are not aware of any statute in Texas providing otherwise.

The Louisiana Supreme Court in *Champagne*, 893 So.2d 773, concluded that the appropriate starting point in a multistate case is to conduct a choice-of-law analysis pursuant to La.Civ.Code arts. 3515 and 3537 to determine which state's law applies to the interpretation of the policy. The choice-of-law articles provide as follows:

La.Civ.Code art. 3515

Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La.Civ.Code art. 3537. General rule

Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Fireman's Fund argues that under choice-of-law analysis in cases deciding insurance issues, e.g., *Zuviceh v. Nationwide Ins. Co.*, 00-773 (La.App. 1 Cir. 5/11/01), 786 So.2d 340, *writ denied*, 01-2141 (La. 11/9/01), 801 So.2d 373, and its progeny, have applied the foreign state's laws and not abrogated the insurance contract. Fireman's Fund argues repeatedly that "the exact same factors at play in *Zuviceh* are present and overwhelmingly weigh in favor [of] not abrogating the Fireman's Fund contract issued and delivered in Texas to Ms. Bernal." We disagree. At the outset, we note that the injured plaintiff in *Zuviceh* was a resident of the

foreign state, not a resident of Louisiana where the accident occurred, and that the insurance issue in *Zuviceh* was the plaintiff's own UM policy provision.

More specifically, in *Zuviceh*, the plaintiff was a Mississippi resident involved in a head-on collision with a Louisiana resident in Slidell, Louisiana. At the time of the accident, Zuviceh had in force a UM insurance policy that was issued to her by Nationwide Insurance Company. The UM policy was negotiated and issued in Mississippi and covered Zuviceh's vehicle, which was registered in Mississippi. Zuviceh petitioned the court for a judgment declaring which state's law governed the interpretation of the UM policy, Mississippi or Louisiana. The trial court conducted a choice-of-law analysis and ruled that Mississippi law should apply. In making its ruling, the trial court determined that Mississippi law applied to interpret the terms of the Nationwide policy because Mississippi had a more substantial interest in the uniform application of its laws than Louisiana had in providing an insurance remedy to an *out-of-state resident* who sustained an injury while temporarily within Louisiana's borders.

Fireman's Fund also cites *Dreisel v. Metropolitan Property & Cas. Insurance Co.*, 01-2705 (La.App. 1 Cir. 12/20/02), 836 So.2d 347, *writ denied*, 03-199 (La. 3/28/03), 840 So.2d 575, which applied Massachusetts law. There, the plaintiff was a Massachusetts resident and guest passenger in a vehicle owned and operated by a Louisiana resident. At the time of the accident, Dreisel had in effect a UM policy issued to her by Metropolitan in Massachusetts, and the vehicle was registered in Massachusetts. Dreisel sought to collect under the Metropolitan UM policy. She was denied coverage based on a reduction clause in the policy providing for a dollar-for-dollar reduction in Metropolitan's liability based on money that the insured collected from the tortfeasor. Metropolitan argued that it had no liability under the UM policy since the tortfeasor's insurance company had already tendered

18

to Dreisel the per person policy limit of $100,000, plus $5,000 in medical payments, an amount which exceeded Dreisel's $50,000 per person UM limit. As a result, Dreisel filed suit against Metropolitan in Louisiana.

The trial court applied Louisiana law and granted Dreisel's partial motion for summary judgment. Metropolitan appealed the trial court's ruling, maintaining that *Massachusetts law should be applied to a Massachusetts insurance contract that expressly provided that the policy would be governed by Massachusetts law.* The first circuit reversed, finding that Louisiana's uninsured motorist statutes do not automatically apply to foreign state policies, but rather a choice-of-law analysis must be employed to obtain the appropriate balancing of competing interests between states. The court cited articles 3515 and 3537 and stated that "[t]he objective is to identify the state whose policies would be most seriously impaired if its law were not applied to the issue at hand." *Dreisel*, 836 So.2d at 350. In that case, the first circuit found that Massachusetts law applied to the issue at hand. In both *Zuviceh* and *Dreisel*, the injured plaintiffs were residents of the foreign state, seeking an interpretation of their own foreign policies.

Fireman's Fund also cites *Norfolk Southern Corp. v. California Union Insurance Co.*, 02-369 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, *writ denied*, 03-2742 (La. 12/19/03), 861 So.2d 579, which applied Virginia law. In *Norfolk*, the plaintiff was a Virginia corporation. Norfolk sought a declaration that it had coverage under several excess comprehensive general liability policies and sought indemnification for the costs of cleaning up various polluted sites around the United States, including three sites located in St. Tammany Parish, Louisiana. After citing the choice-of-law articles, La.Civ.Code arts. 3515 and 3537, the first circuit conducted a lengthy analysis demonstrative of the reasoning used in the other cited cases involving UM conflicts. In reviewing the relevant law of Virginia and Louisiana, the *Norfolk* court

19

found a genuine conflict between the laws of the two states concerning the issue of the effect of late notice to the insurance company. In determining that Virginia law should govern certain issues, the first circuit articulated as follows:

> Virginia clearly has the more significant contacts with the parties and the transactions at issue in this case. The London Insurers issued the insurance policies in favor of Southern Railway Company and Norfolk Southern Corporation. Southern Railway Company was organized under the laws of Virginia in 1894, and Norfolk Southern Corporation was incorporated in Virginia in 1982. Norfolk and Western Railway Company, which merged with Southern Railway to form Norfolk Southern Corporation, is also a Virginia corporation. All of these companies do business in Virginia. In addition, Norfolk's main casualty and insurance claims offices are located in Virginia, and Norfolk provided notice of its claims regarding these insurance policies from its offices in Virginia. The remaining plaintiffs are all subsidiaries or controlled companies of Norfolk Southern Corporation incorporated in various places throughout the United States. Although some of these parties conduct business in Louisiana, none is incorporated in Louisiana or has its principal place of business in the state.

> Moreover, Virginia was the site of the negotiation and delivery of many of the policies at issue here. Norfolk was represented in the negotiations concerning these policies by its brokers in Virginia, Missouri, and London. All of the policies were delivered to Norfolk in either Virginia or Washington, D.C. No negotiations took place in Louisiana, and no policies were delivered to Norfolk in Louisiana.

> Virginia has a compelling interest in the regulation of its insurance industry and in the contractual obligations that are inherent parts thereof. The integrity of the contract is a substantial and real interest. The fact that Congress has allowed fifty states to have their own uniform system of regulations governing insurance strongly suggests that this is a legitimate public purpose. *Zuviceh v. Nationwide Insurance Company*, 00-0773, p. 7 (La.App. 1st Cir. 5/11/01), 786 So.2d 340, 346, *writ denied*, 01-2141 (La. 11/9/01), 801 So.2d 373.

> In addition, we note that the circumstances of this case are entirely distinguishable from those of *In re Combustion, Inc.*, 960 F.Supp. 1056 (W.D.La. 1/15/97), on which Norfolk relies. That suit involved a class action by

several thousand individuals seeking damages for both personal injury and property damage arising out of the operations of a CERCLA Superfund hazardous waste site in Livingston Parish. The plaintiffs filed suit against numerous generators and transporters allegedly responsible for the contamination at the site and their insurers. The defendants also filed cross-claims against their insurers.

The court determined that the public policy of Louisiana and the circumstances of the case required that Louisiana law apply to all actions brought pursuant to the Direct Action Statute. *In re Combustion, Inc.*, 960 F.Supp. at 1057. Specifically, the court focused on La.R.S. 30:2002, which declares the maintenance of a healthy and safe environment for the people of Louisiana "a matter of critical state concern." In addition, the court considered certain circumstances of the case to be crucial to the analysis, including the direct effect the contamination had on Livingston Parish and its citizens. *In re Combustion, Inc.*, 960 F.Supp. at 1068.

*The case before this court, however, does not involve a direct action by injured Louisiana residents against the insurance companies.* The only plaintiffs in this suit are the insureds themselves, and the court is only called on to decide issues concerning the interpretation of contracts between the parties to those contracts. We note that the *In re Combustion, Inc.* court itself distinguished cases such as this one involving a dispute only between insureds and insurers from those involving direct actions by injured parties. *In re Combustion, Inc.*, 960 F.Supp. at 1070-1071.

Moreover, the insurance policies at issue here are comprehensive general liability policies intended to provide indemnity to Norfolk for liability arising out of the conduct of its business, regardless of the location of the risk. It is true that Norfolk's losses at issue in these appeals occurred in Louisiana and that Louisiana has an interest in ensuring that its environmental sites are remediated; however, no private actions have been filed against Norfolk with respect to any of the Louisiana sites. *There is no evidence that any Louisiana resident would be affected by a denial of coverage in this suit,* since Norfolk is simply seeking reimbursement for costs it has already paid as response costs ordered by a governmental entity. *There is also no evidence that any Louisiana resident has been injured by the contamination at the sites.* Therefore, Louisiana's interest in this case only arises because a Virginia corporation, along with certain of its subsidiaries and controlled companies, has filed suit in Louisiana seeking indemnity under insurance policies delivered

entirely outside of Louisiana (and primarily in Virginia) to recover payments it has already made as compensation for damage caused to property located in Louisiana. Such an interest is not sufficient to override the compelling interest Virginia has in regulating its insurance contracts. *See Shell Oil Company v. Hollywood Marine, Inc.*, 97-106, 97-611, p. 8 (La.App. 5th Cir. 10/15/97), 701 So.2d 1038, 1041.

*Norfolk*, 859 So.2d at 180-82 (emphasis added) (footnotes omitted).

Similarly, in *Holcomb v. Universal Insurance Co.*, 93-1424 (La.App. 3 Cir. 6/1/94), 640 So.2d 718, *writ denied*, 94-1740 (La. 10/7/94), 644 So.2d 643, a panel of this court applied Arkansas law to an interpretation of a policy issued and delivered in Arkansas after conducting a conflict-of-law analysis. There, the accident occurred in Louisiana, but the Louisiana residents involved had settled out of the suit. Accordingly, the panel articulated:

> The action under consideration herein is likewise a matter of contract interpretation. The insurance policy herein was entered into between an Arkansas insurance company . . . and an Arkansas resident/domiciliary . . . to provide coverage on a vehicle registered, titled and garaged in Arkansas. That policy is being sued on by other Arkansas residents/domiciliaries seeking coverage under that contract (policy) for damages they allegedly sustained. The only Louisiana contacts are the heretofore released tortfeasor and the site of the accident. Neither is relevant to the issues to be decided herein. *No Louisiana resident or company is a party to this action; and, inasmuch as a complete release has been executed in favor of all Louisiana parties, the outcome of this action will not affect any policy of or party in this state.*
>
> . . . .
>
> . . . In this case, although the accident occurred here and involved a Louisiana resident, the latter is totally unaffected by our decision. Were the circumstances otherwise, i.e., *if a Louisiana resident were directly affected, this fact would not necessarily dictate the application of Louisiana law but would be pertinent to a determination of the choice of law to be applied.*

*Id*. at 722 (emphasis added).

In *Adams v. Thomason*, 32,728 (La.App. 2 Cir. 3/1/00), 753 So.2d 416, *writ denied*, 00-1221 (La. 6/16/00), 764 So.2d 965, the plaintiff was struck by a cotton trailer in Richland Parish, Louisiana, while he was leaning on a parked truck occupied and operated by a Wisconsin resident. The Wisconsin resident had in force a UM policy that was negotiated and issued to him in Wisconsin by State Farm. The plaintiff and his wife filed suit in Louisiana, seeking damages for his injuries. State Farm, the defendant's insurer, was one of numerous named defendants. The trial court ruled that the State Farm UM policy provided coverage for the accident but applied Louisiana law to the State Farm policy. Other Louisiana residents were involved in and affected by the accident, and the insured was working in Louisiana at the time of the accident. Accordingly, the court articulated that:

> Louisiana had compelling interests that superseded those of Wisconsin and would be adversely affected if Louisiana law were not applied. Louisiana has a substantial interest in regulating awards to victims injured on its highways and in protecting those persons from uninsured and underinsured motorists. Consequently, we find that Louisiana law is applicable to the State Farm policy.

*Id*. at 427.

As we previously indicated, while not determinative, the residence of the injured plaintiff is pertinent and is a factor in determining choice-of-law issues. In the much-cited case of *Champagne*, the Louisiana Supreme Court found that, under the facts of that case, Mississippi had a more substantial interest in the uniform application of its laws governing insurance contracts than Louisiana had in providing an insurance remedy to an *out-of-state resident* who was injured while transitorily within the borders of Louisiana. *Champagne*, 893 So.2d at 773. Such is not the case here. In this case, the injured plaintiff, Boutte, was a resident of New Iberia, Louisiana. He was rear-ended in nearby Lafayette, and he clearly has expectations of protection from and by the laws of Louisiana.

23

In *Dunlap v. Hartford Insurance Co. of Midwest,* 04-725, p. 6 (La.App. 1 Cir. 3/24/05), 907 So.2d 122, 125, where the plaintiff was a Louisiana resident who had been run off of the roadway by a phantom driver, the court found that, where the accident occurred in Louisiana, and all of the plaintiff's medical treatment related to the accident had been and probably would continue to be provided by doctors and hospitals in Louisiana, the plaintiff "would expect to be protected by its laws, including Louisiana's strong public policy to promote full recovery for innocent accident victims."

In the present case, Fireman's Fund has argued that a determination of whether Texas or Louisiana law is applicable to the enforcement of the insurance contract is not dependent upon the relationship of the parties *in this case* to the insurance contract but to the relationship of the parties *in the contract.* That is to say, the injured parties not involved in the contract, whether they be plaintiffs or defendants, are not factors for consideration. If that were true, then there would be no balancing of competing interests; every contract between an insured and an insurer would simply be upheld under the laws of the foreign state, no matter how severe the injury done in Louisiana to a Louisiana resident and no matter how invasive and violative of Louisiana policy the foreign contract is. We strongly disagree with this contention that the choice of law must be based only upon the relationship of the parties contracting for the insurance. Jurisprudence has held that La.Civ.Code arts. 3515 and 3537 must be read together, as do the articles themselves. In *Dunlap,* the court articulated as follows:

> Zurich contends the focus of the court's analysis should be on the parties to the contract, Zurich and Iafrate, rather than the parties to the lawsuit or occurrence, which would include Dunlap. We disagree with this contention, noting first that Article 3515 instructs the court to examine the relationship of each state to the parties **and the dispute**, and Article 3537 invites analysis of the nature, type, and

purpose of the contract, as well as the policies referred to in Article 3515.

*Dunlap*, 907 So.2d at 124 (emphasis in original).

We will proceed accordingly. In the present case, Fireman's Fund argues that the relevant facts require a finding that Texas law be applied in this case because the policy containing the named-driver exclusion was issued and delivered to Eva Bernal, who is a Texas resident; the insured vehicle is owned by a Texas resident, Modesto Paredes, and was leased to Bernal; the insured vehicle was licensed, registered and garaged in Texas; and the vehicle was allegedly being driven by a Texas resident, Juan Lara, and not a Louisiana resident. On the other hand, our *de novo* review of the record reveals the following:

> The contacts with Louisiana are as follows:
>
> Boutte was a sixty-year-old citizen of Louisiana at the time of the accident and has been a resident of New Iberia, Louisiana and Lafayette, Louisiana.
>
> Boutte had a social security number, and he had a valid Louisiana chauffeur's license that was not to expire until September 2005.
>
> Boutte had also worked as a cook on off-shore boats and was described by his Louisiana physicians as a quiet gentleman with a limp.
>
> At the time of the accident, Boutte was in his vehicle in Lafayette, Louisiana, stopped behind another vehicle that had stopped for construction.
>
> Boutte's vehicle was owned, garaged and licensed in Louisiana.
>
> Boutte's vehicle was violently struck from behind in Louisiana, pushed into another vehicle, and burst into flames near his city of residence.
>
> Boutte suffered the loss of his guest passenger in Louisiana.

Boutte suffered various injuries including injuries to his back, shoulder, and pelvis and was disabled and hospitalized in Louisiana.

Boutte was treated by physicians in New Iberia and Lafayette, Louisiana.

The investigating police officers are Louisiana residents.

The fire department and ambulances are Louisiana residents.

The coroner is a Louisiana resident.

The accident was in view of Louisiana residents and affected Louisiana residents.

Almost all of the witnesses are residents of Louisiana.

The medical experts are Louisiana owned.

Defendant driver was allegedly in Louisiana to avail himself of Louisiana's prices on vehicles being sold in Louisiana.

Defendants in the accident are believed to have received medical treatment in Louisiana.

Defendant Fireman's Fund has offices and does business in Louisiana.

In contrast to the numerous contacts of plaintiff and defendants with Louisiana as listed above, the contacts with Texas are minimal.

The contacts with Texas are as follows:

Defendants Bernal and the Laras resided and worked in Houston, Texas.

Eva Bernal leased, insured, and garaged the subject vehicle in Texas.

Defendant Fireman's Fund issued and delivered the insurance policy in Texas.

The driver of the Misubishi is believed to reside in Texas.

However, the negatives outweigh the positives with regard to the defendants' contacts with Texas:

26

Defendant Bernal was not a citizen of Texas or any other state.

Defendant Bernal has never incorporated a business in Texas.

Defendant Bernal never received or issued a check for wages in Texas.

Defendant Bernal kept no business records in Texas.

There is no evidence in the record of Texas licenses of any kind for any of the individual defendants in this case.

Defendant Eva Bernal did not obtain a social security number in Texas and testified to not having a social security number.

Defendant Bernal did not have a Texas driver's license at the time of the accident or for the majority of the time she resided in Texas; and the record contains no evidence of one.

Defendant Bernal has no Texas identification in the record except possibly an expired work permit card possibly issued in Texas; the card is stamped "not valid for reentry to U.S."

Defendant Bernal's "business" at the time of the accident existed for about one month and no longer exists, having dissolved two weeks after the accident.

Defendant Bernal did not own real property in Texas.

Defendant Bernal allegedly has no contact in Texas with the men who were driving her vehicle in Louisiana.

While it is true that Texas has an interest in enforcing and protecting the integrity of its contracts in Texas, Louisiana clearly has the more significant contacts with the parties and all of the transactions at issue in this case. In fact, Louisiana has numerous contacts with Fireman's Fund, which has offices and agents and a very visible presence in Louisiana. Louisiana clearly has more compelling interests that supersede those of Texas and would be adversely affected if Louisiana law were not applied. Louisiana has a more substantial interest in regulating awards to Louisiana

27

citizens injured on Louisiana highways, than Texas has in this case in enforcing a temporary contract with a non-citizen of its state. Given the facts and circumstances of this case, the issues herein are a matter of critical state concern and Louisiana public policy.

> The legislature has enunciated public policy concerning the purpose of liability insurance in La.R.S. 22:655(D) which provides, in pertinent part, that "all liability policies . . . are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable; and, that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy." *The purpose of the compulsory automobile liability insurance law is not to protect the owner or operator against liability but to provide compensation for persons injured by the operation of insured vehicles.* Couch, Cyclopedia Of Insurance Law, Vol. 12A, § 45:682 (2d ed.1981); *Cormier v. American Deposit Ins. Co.*, 95-865 (La.App. 3d Cir. 12/6/95), 664 So.2d 807; *Fields v. Western Preferred Casualty Co.*, 437 So.2d 344 (La.App. 2d Cir.), *writ[s] denied*, 440 So.2d [528,] 754 (La.1983).

*Adams v. Thomas*, 98-2003, 98-2005 (La. 4/13/99), 729 So.2d 1041, 1043.

It is also important to note that Fireman's Fund anticipated contacts with Louisiana and other states where the language in its contract with Eva Bernal stated:

> b.      Out of State Coverage Extensions.
>
> While a covered auto is away from the state where it is licensed we will:
>
> > (1)      Increase the Limit of Insurance for Liability Coverage to meet the limit or limits specified by a compulsory or financial responsibility law in the jurisdiction where the covered auto is being used.

Fireman's Fund writes insurance in numerous states, including Louisiana. By its own terms, it anticipated that the insured vehicle would be driven

in other states and that the policy would be susceptible to enforcement in other states under the laws of other states. In *Zuviceh*, so heavily relied upon by Fireman's Fund, the court articulated that an out-of-state coverage provision such as the one above is a significant factor that distinguishes the application of foreign law in *Zuviceh* from other cases wherein no such language exists. The court stated as follows:

> In conducting our analysis, we are guided by our previous decision of *Francis* [ *v. Travelers Insurance Co.*, 581 So.2d 1036, (La.App. 1 Cir.), *writs denied*, 588 So.2d 1114, 1121 (La.1991)]. However, we are mindful that *Francis* was decided before the enactment of LSA-C.C. arts. 3515 and 3537. Moreover, *we find the fact that the policy at issue in Francis contained a provision regarding consideration of other states' laws to be crucial to the finding that Louisiana's law applied. As previously noted, Nationwide's policy contains no such provision.*

*Zuviceh*, 786 So.2d at 348 (emphasis added).

We also note that, even though *Francis*, as referenced above in *Zuviceh*, was decided before the choice-of-law analysis was codified in La.Civ.Code arts. 3515 and 3537, the first circuit in that case performed an "interest analysis" to determine whether Louisiana or Ohio law applied to a UM policy. In *Francis,* the plaintiffs were Louisiana residents who had been injured in Louisiana while they were guest passengers in a car owned and driven by Ohio residents. The owner of the car had an Ohio policy with a UM limitation on liability different from Louisiana's but also had an out-of-state coverage provision similar to the one at issue herein. After conducting the "interest analysis" to determine the choice-of-law state, the court concluded as follows:

> Initially, we note that the Motorists policy does not state that it shall be governed by Ohio law. On the contrary, the policy contains provisions relative to "out of state coverage," wherein it states that if accidents occur in other states, the policy will be interpreted to provide at least the minimum amounts and types of coverage required by the laws of such other states.

29

> Clearly, Ohio has an interest in the uninsured motorist coverage issue. However, Motorists simply could not have contemplated its insured driving only in Ohio and the policy being governed solely by Ohio law. In fact, the territorial provision of the policy includes all of the United States. The contracting parties were surely aware then that the law of any state, including Louisiana, might be applicable to a particular claim.
>
> Louisiana, on the other hand, has a great interest in regulating awards to victims injured on its highways and in protecting its citizens from uninsured or underinsured motorists.
>
> After weighing the interests of both states, we conclude the interest of Louisiana outweighs the interest of Ohio. As such, we hold Louisiana law is applicable in this case.

*Francis*, 581 So.2d at 1042.

Accordingly, we find that, as a matter of law, Louisiana law applies to the coverage in this case and that the named-driver exclusion which is against Louisiana policy is invalid and does not apply to prohibit coverage.

Fireman's Fund further argues that, even if its named-driver exclusion were found invalid, the policy can only be reformed to provide minimum coverage of $10,000/$20,000 pursuant to *Marcus v. Hanover Insurance Co.*, 98-2040 (La. 6/4/99), 740 So.2d 603. We disagree. In *Marcus*, the court determined that a business use exclusion contravened the purpose of the Louisiana Motor Vehicle Safety Responsibility Law and La.R.S. 22:655(D) and reformed the policy to provide the minimum coverage set forth in our compulsory financial responsibility laws, not the coverage amount set forth in the policy therein. In the present case, the named-driver exclusion contravenes Louisiana public policy to protect injured victims in La.R.S. 22:655(D) *and* contravenes La.R.S. 32:900(B)(2)(d), which specifically provides that coverage for the excluded driver in a commercial policy must be provided in another policy in an amount "*equal to that coverage provided in the*

*policy for which the person was excluded.*" Accordingly, the Fireman's Fund policy in this case will be reformed to provide coverage in the full amount stated in the policy.

IV.

## CONCLUSION

Based upon the foregoing, we reverse the judgments of the trial court which granted summary judgment to Eva Bernal and to Fireman's Fund. Our *de novo* review of the record reveals that genuine issues of fact prohibit summary judgment in favor of Eva Bernal ad that Fireman's Fund is not entitled to summary judgment as a matter of law. Accordingly, we reverse the summary judgment dismissals of Eva Bernal and Fireman's Fund and remand the case for a trial on the merits in accordance with the coverage determinations made herein. All costs of this appeal are assessed to the defendants in this case.

**REVERSED AND REMANDED.**